**Arthur H. SAMISH, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 14261.**

United States Court of Appeals
Ninth Circuit.

May 20, 1955.

Rehearing Denied July 8, 1955.

Harold C. Faulkner, Wilbur F. Mathewson, Allan L. Fink, Melvin, Faulkner, Sheehan & Wiseman, San Francisco, Cal., for appellant.

Lloyd H. Burke, U. S. Atty., Robert H. Schnacke, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, CHAMBERS, Circuit Judge, and CLARK, District Judge.

CHAMBERS, *Circuit Judge.*

Arthur H. Samish appeals from his conviction on eight counts of an indictment charging him with wilfully attempting to defeat and evade payment of income taxes.

The alleged income which he did not report on his income tax returns for the years 1946, 1947, 1948, 1949, 1950 and 1951 [1] concerns a series of checks drawn by the Biow Company, a New York advertising agency. The checks varied in amounts from $950 to $5,000.[2] At first the checks were payable to known Samish business associates, relatives or simply friends. Later the checks as issued were written to fictitious payees. With two or three exceptions, Samish admits receipt of all the checks. Only one does he deny receiving.

In 1943 the defendant played some part in getting for the Biow Company a substantial portion of the advertising business of Schenley Distillers, a very fine account for an advertising agency. Samish was a friend of Louis Rosenstiel, chairman of the board of Schenley. The leading actors for Biow in the events with which this court is concerned were Milton H. Biow, president, and Morris Zinneman, treasurer. Biow's admit that in making the remittances to Samish, for whatever reason the checks were sent, they falsified their books in that they charged the amounts thereof to various radio, television, magazine and newspaper accounts. But orally they stoutly maintained the checks were given Samish as compensation for securing Biow the Schenley account. There clearly appears to have been sufficient testimony to withstand the motion for acquittal made by defendant at the end of plaintiff's case.

Defendant, as well he may, admits that the evidence is sufficient to sustain the jury's verdict. On the issue of unreported income, it can be said that it is overwhelming.

From a practical standpoint the defense of Samish was to "try" Biow. And if Biow's low standard of morality as shown in the record is any excuse for Samish, then Samish ought to go free.

Many of the appellant's assignments of error concern the Biow testimony in one way or another. But first it seems proper to deal with Samish's story about the checks. Eventually Samish, in defense, took the stand.

Extensively, portions of the Samish testimony are set forth seriatim, either verbatim or summarized narratively:

1. Samish, a resident of California, filed separate returns for himself and his wife, Merced C. Samish, for the years 1946 and 1947, splitting community income between the returns. For the years 1948, 1949, 1950 and 1951 he filed joint returns. Each of the eight returns was the subject of one count in the indictment.

2. The total of all checks proved was about $90,000.

1. In a preliminary conversation with Al Lyon, president of Philip Morris Co., in 1944, Lyon said to Samish regarding Biow's obtaining the Schenley account, "You are entitled to a finder's fee or some monies." Samish replied, "Al, I am not interested in receiving anything for myself; I represent Schenley interests; I can't—I can't take anything." Said Lyon, "Well, don't be a fool. You are entitled to something. You have got a lot of political contributions to make." Said Samish, "I have some very fine personal friends, too."

2. Soon after, Samish saw President Biow, and Samish says Biow said, "Art, we are very appreciative of getting this Schenley account." Samish continues that Biow told him that Mr. Lyon had talked to him about some political contributions and gifts and said that if he (Samish) would go to Mr. Zinneman he would have some checks for him.

3. Shortly thereafter, Samish was dealing with Zinneman, Biow's treasurer, and Zinneman reported, according to Samish, that Biow had talked to him, and Zinneman asked Samish for the names for some checks. Samish says that he suggested the use of his name. Zinneman protested that he didn't want Samish's name and that he didn't even want Samish to endorse the checks, for reasons which Zinneman said were his business. Thereupon, Samish gave him some names for checks.

4. One of the first checks received by Samish was in the amount of $2500 payable to his secretary, Dorothy L. Ready. Of this he says, "I made a present to her as a gift to her from Mr. Biow."

5. Another check was handed by Samish to one Miss E. Mack. Samish says it was given to Miss Mack "as a gift from Mr. Biow."

6. Another check, says Samish, was handed to Mr. Frank Howard as a gift from the Biow Company.

7. Another check, in 1948, says Mr. Samish, was given to Miss Ready "as a gift from Mr. Biow."

8. In 1949, says Samish, he "handed a $2500 check to Miss Ready as a gift from the Biow Company."

9. Another check, in 1949, went to F. Howard, Samish's son-in-law, "as a gift from the Biow Company."

10. In 1950, a check went to A. Robbins, a friend of Samish, "as a gift from the Biow Company." Following the testimony concerning some of these presents, including the Robbins check, Samish said, "Well, the reason being * * * the three or four—I think it is four—that I gave these gifts to were close friends and people who I liked and people who I wanted to do something for, like I have done for many other people."

11. The checks used for political purposes and payable to fictitious payees, Samish related, he was able to cash at various places without himself making any endorsement thereon. Generally, he said, the proceeds of the checks went into an envelope or political "kitty" which he usually kept in his safe, although he did make some distribution of the proceeds of checks which he cashed for political purposes in New York without taking the checks to the envelope in his safe in San Francisco where he ordinarily kept the "kitty." Generally Samish could not identify the political recipients of the proceeds of the checks which he reported were used for political purposes.

12. At another point in his testimony concerning the transactions with President Biow, Samish testified as follows:

"I recall some kind of a conversation wherein he stated that he wanted to compensate me or something of that sort and I very definitely told him that under no circumstances can I accept any compensation. I had no objection if he wanted to put me on his payroll or anything, but as Mr. Lyon stated, and I stated to Mr. Lyon at the time, that I explained to Mr. Biow that— * * * I told Mr. Biow at the time during that conversation that under no circumstances could I receive any compensation from him for the help of securing any account, or—and he further stated to me during

some conversation, during the talk with Mr. Lyon, and I reiterated, that while I couldn't receive any compensation, if he wanted to make some political contributions or some gifts to some friends of mine who I would indicate, that that was entirely up to him."

13. It further appears from the Samish testimony that Treasurer Zinneman did not know any of the live payees, and that Zinneman showed no interest in the identity of the payees. Further, in the early stages of the series of check transactions, Samish furnished all of the names of the payees.

14. Samish was asked if he remembered any political campaigns in which the Biow Company had any interest whatsoever. He replied, "What would they have an interest in campaigns for?" Then he was asked, "These were political contributions that were to be made for the Biow Company, were they not?" His response was, "Not to my knowledge." Then, to the question, "They were political contributions to be made by you, is that correct?" he responded, "They were political contributions. I don't say the year 1944, but whenever they were made, given to me to use at my discretion." Then, following the question, "In any way that you saw fit, is that right?" he answered, "Well, I would think so, having in mind they had a full knowledge that I was concerned about political contributions."

15. Again, Samish was asked, "Do you know of any campaign in California in 1944 in which the Biow Company had an interest?" To this he replied, "I would say no."

16. Again concerning the earlier checks, Samish said, "Well, I believe that Zinneman would call me and ask me for some names and I would give them to him." Samish, however, contends that all amounts were fixed by the Biow Company.

17. Later on, Samish testified that many names he supplied Biow were the names of persons that "I had some knowledge of, that I was sure wouldn't have any objection to their name being used." At another time Samish says, "The Biow money, the Biow political contributions, made it possible for me to be more generous at times with political contributions than I could ordinarily be."

18. To the question, "Did you feel there was anything wrong about the fact that you were taking money from the Biow Company," Samish replied, "No, sir."

19. Again, the Biow money "was just an accumulation of money that was there [in Samish's safe] to be used for political purposes—political campaigns."

This court is of the opinion that Samish's own testimony concerning all of the checks except four shows almost conclusively that the money (the four checks excepted) received from the controversial checks was taxable income. One begins with the business background. Samish, without question, had done Biow a huge business favor. Biow offers to pay Samish. Can Samish avoid tax liability by saying, "You can't pay me. But you can make some gifts to friends of mine [not yours]. Give me the checks. Let me present them. And you can also give me some political money"? Someone owned the checks at the moment they were in Samish's hands. That man was Samish. Someone owned the proceeds of the political checks while he held the proceeds. That owner was Samish until he disbursed them. See Old Colony Trust Co. v. C. I. R., 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918. The facts might admit of some other conclusion if Biow had any knowledge or affection for any of those Samish describes as his "fine friends" who received some of the "gift" checks. As to the "political" checks, the result might be otherwise if Samish had not stated that Biow had no interest in Samish's political operations. It is negatived that Biow had any political objectives, either generally or specifically, in California or anywhere else. Biow did not even say, "You know what we believe in. Put our money where you think it will generally vindicate what we believe in."

It well may be that the testimony of Samish as to the "whys" and "hows" of the Biow checks is untrue. Certainly it stretches human credence to believe that he knew so little as he said he did about the proceeds of any given "political" checks. And it amazes one to hear that he would be able time after time to cash checks made to fictitious payees without a word of explanation to the person cashing as to the lack of endorsement.

On the whole, this court deems that the Samish "alibi" is almost a judicial admission from the witness stand that the checks (four excepted) were income. Certainly the defendant is not entitled to a better set of facts than he unmistakably claims them to be.

■ Judicial admissions from the stand are something to be accepted cautiously as concluding an issue. For example, if testimony of a defendant as to a fact is essentially one of opinion, such as speed, the time a car entered an intersection, the point of impact, undoubtedly a party is entitled to have the jury consider more favorable testimony than his own.

However, here had Samish paid his taxes, sued the collector for his taxes back, as he tells the story a trial judge might have been justified in instructing the jury that these particular "gifts" and "contributions" to Samish or through Samish were Samish's income. It appears that the opinion of Mr. Justice Douglas in Robertson v. United States, 343 U.S. 711, 713, 72 S.Ct. 994, 96 L.Ed. 1237, almost goes this far.[3] However, this court is not sure that the opinion positively eliminates the element of intent on the part of the payor, Biow. Therefore, this decision will assume that the intent of Biow remained material to the issue of income or gift. But this court does not hold that one who has performed services of value to another for which he is entitled to be paid—which the recipient proposes to pay—can remove the payments from income to gift by his unilateral act of saying,

"Don't pay me. Just give me some sizable gifts."

Even if the trial court would have been justified in telling the jury that the checks (four excepted) represented reportable income, that would not amount to a directed verdict in favor of the government. Even when there are no issues left for a defendant, a jury has the power to find the defendant not guilty.

And if Samish's own testimony proved the payments were taxable, he would not be stripped of defenses. The question of wilfully attempting to defeat and avoid payment would be still wide open. For example, Samish says his tax consultant had all the facts as to the checks from Biow. He relied on the tax consultant, now dead. He paid no attention to the returns, he said, except to look for the "X" on the signature line where he was supposed to sign. If the jury believed this portion of the alibi, certainly there was nothing wilful about his failure to report and pay.

■ Defendant's first major assignment of error concerns the fact that the United States attorney in his opening statement told the jury that he would prove that appellant gambled a million and a half dollars in the year 1949 and won $25,000 which he failed to report in his income tax return. In aggravation of this statement, says the defendant, three witnesses laid a foundation (or attempted to) for the admission of certain gambling house records which tended to connect Samish with certain betting transactions. Countering this, the government says the records were admissible and were improperly excluded. Whether the records were admissible will not be here decided beyond saying that the records presented a very close question as to whether they should be received. A very important consideration in determining whether the defendant had a fair trial is to ascertain if the government was overreaching. An examination of the record indicates that the records

---

**3.** See also Noel v. Parrott, 4 Cir., 15 F. 2d 669.

were such that the United States attorney had a duty to try his level best to get the records in evidence. If he failed, should that result in a mistrial? One necessarily must read the whole record. First, with respect to the residual effect in the jury's mind after the foundation testimony of the three witnesses was stricken, it is doubtful under all the circumstances if there was any prejudice to the defendant. The trial judge considered whether any prejudice had been done and instructed the jurors to disregard the testimony. The collapse of the government's witnesses probably inflicted damage only on the government. Generally the defense so quickly and successfully moved the case back into the yard of Biow for so much of the time and the issues for days after left this matter of the "gambling income" so far behind that only a captious appraisal of the case would hold that these early incidents of the case were prejudicial.

Defendant complains of a schedule prepared by a revenue agent summarizing the evidence concerning the many Biow checks sent to Samish. Items of the summary listed the check number, date of check, Samish's whereabouts on date of issue, what evidence (Samish's travel record or hotel record) pointed to Samish's whereabouts on the date in question, the amount of the check, the name of the drawee bank, the date cashed or deposited, the record as to Samish's whereabouts on the latter date, and a list of endorsements on the various checks. The receipt of the summary as to the checks seems entirely proper. Wigmore on Evidence, 3d Ed., Sec. 1230. Papadakis v. United States, 9 Cir., 208 F.2d 945; United States v. Kelley, 2 Cir., 105 F.2d 912. But assuming arguendo that the exhibit was improperly admitted, it cannot be said that the summary in any way weakened Samish's two main points that the checks were gifts and that his failure to report the payments, if they were reportable, was the fault of his tax consultant.

Samish assigns as error the fact that he was not permitted to impeach, by the witness Lyon, Biow's version of a telephone conversation, Biow on one end and Lyon and Samish successively on the other. Biow and Samish told diametrically opposite stories as to whether in certain conversations Biow admitted he had wronged Samish by certain written statements he and Zinneman had given to internal revenue agents. The statements generally were in accord with the Biow testimony given later upon the trial. It appears that the Biow testimony was probably of such materiality as to be impeachable by contradictory statements. Even the alleged statements of Biow might have furnished affirmative evidence for Samish. (The latter point is not decided.) But a reading of the testimony and the record of the colloquy of court and counsel leaves this court with an abiding doubt as to whether the trial court did reject the testimony on the ground an inadequate foundation had been laid or other grounds. A trial judge in determining the sufficiency of a foundation necessarily must be permitted considerable latitude.[4] While the court was rather firm in its rulings on the testimony, it would not be appropriate to find error in the rulings unless there were a better showing of a foundation. For example, counsel for appellant, while interrogating Lyon, apparently misspoke and used the wrong date by two months as the date of the conversation. Perhaps the court knew what conversation counsel meant, and, again, it might not have. Hence in the condition of the record a contention of error cannot be sustained.

Furthermore, assuming the exclusion was error, it is to be pointed out that Samish had on many points impeached Biow. The testimony, if admitted, does not produce the belief that it would have tended to swing the scales. The whole evidence of the case is so overwhelming against Samish and particularly his own story, so difficult of be-

---

4. United States v. Angelo, 3 Cir., 153 F.2d 247; Atlantic Greyhound Corporation v. Eddins, 4 Cir., 177 F.2d 954.

lief, was so damning that it doesn't appear that Samish was hurt by a ruling which limited him to showing on one more point that Biow was unworthy of belief. Little doubt can there be that if the jury had had Biow within its reach it would have found him guilty of most any charge selected at random.

■ Error is assigned in permitting the noted handwriting expert, Clark Sellers, to present opinion testimony on rebuttal that three checks, the receipt of which was questioned by Samish, had been endorsed in the handwriting of associates of Samish. It may be assumed that the testimony would have been proper for the case in chief. But certain testimony may be proper both in chief and in rebuttal. The offering of the testimony at the beginning may not seem necessary at the moment, and while prosecutors have a duty to play fair with defendants, it is not unfair to offer testimony on rebuttal which is proper rebuttal, although it might have been offered in chief. Also, whether the point was to be proved by Sellers or by other witnesses is within the prosecutor's discretion. The contention that Sellers' testimony was not material is without merit. Much of the complaint of Samish about Sellers is that Sellers was a great showman. But no indication appears in the record of any impropriety on the part of the witness. How could a rule be sustained excluding a witness because he is a good actor? Such a rule might also be extended to good actors who are defense attorneys or prosecutors.

■ Next the defendant complains that the prosecutor commented in argument to the jury that Dorothy Ready was Samish's secretary and he had not called her as a witness. Actually she was held throughout the trial on a subpoena issued at the request of plaintiff. Defendant promptly complained about the remarks, but the court did nothing about the complaint. Reliance is placed upon Himmelfarb v. United States, 9 Cir., 175 F.2d 924. In Himmelfarb it appears the witnesses not called probably were witnesses with no particular connection with either side of the case. Practically and legally the witnesses in Himmelfarb were available to either side of the case. Here in the context of the district attorney's reference to Miss Ready there appears that little damage could have been done to the defendant. Furthermore, it would seem that any rules restricting comment on failure to produce witnesses should be restricted to those who are available both legally and practically to one side. Wigmore on Evidence, 3d Ed., Sec. 288. To say that Miss Ready was equally available to both sides is to ignore plain facts. Miss Ready was the faithful secretary to Samish for years. He so testified. It is not to reflect on her integrity to say that she undoubtedly continued to see events through his eyes. The relationship here is like that in United States v. Beekman, 2 Cir., 155 F.2d 580, where a party's employee was held not equally available to his opponent as a witness and the court found no error in his opponent's comment on the failure to call him. Also, Samish's failure to call his secretary well could have been because he feared her testimony under cross-examination might increase the evidence that the creation of the check payees was a farcical deception making clearer the payments to Samish as income to him and possibly show to the jury her belief in his guilt.

■ The court gave the following instruction:

"The law does not require that any taxpayer segregate his deductible expenses in any way, nor that any deductible expenses be carried on the taxpayer's books under any particular account name. *If an item of expense, such as commissions, is included in the total deductible expenses on any taxpayer's books, it is immaterial under which particular deductible expense account it might appear.* All ordinary and necessary expenses incurred in carrying on a business, including compensation for personal services rendered, are allowed as a deduction." (Italics added.)

The defendant complains vigorously of the giving of this instruction.

Better would it have been if the instruction had not been given. It does seem to pass lightly over the keeping of dishonest books.

Looking for a moment at the fact issues involved, it seems that the books were admissible at the outset to show the intent of Biow in the matter. The false books show an intent to treat the payment as business expense. Possibly they are also susceptible of some inference that Biow intended to make Samish presents of the questioned checks. It is doubtful if any juryman, instructions notwithstanding, would still think Biow kept his books honestly or that the court had told him that Biow did. At any event, in view of the overwhelming testimony of the whole case, it is not to be said that the instructions were prejudicial to the defendant. But under the instructions as a whole, it appears that the jury was still entitled to use the false books as evidence of an intent to make a gift. Read in the light of all the instructions, the one in particular complained of now has been overemphasized by appellant. Further, the interpretation of defendant begs the question. Read the instruction closely. The effect is: No harm is done if a taxpayer puts a deductible item under the wrong class of deductions, it is still deductible. The instruction does not purport to say the checks were not gifts or that it cannot be inferred from the false bookkeeping that the items were gifts. The instruction begins, "If an item of expense such as commissions, etc." This did not tell the jury that the checks were properly entered as commissions. The defendant exploited to the Nth degree the misdeeds of Biow. This instruction did not stop him or seriously cramp him.

■ Also, complaint is made of this instruction:

"If you find it to be a fact that the Biow Company charged to business expenses any payments that you may find to have been made to the defendant, you may consider that fact among other facts in determining whether or not the Biow Company intended such payments to be gifts."

This instruction permits the jury to consider how the entries were made. If the books were admissible, as they were, the instruction was proper. A close reading of the instruction would indicate that the instruction lets the jury find either "gift" or "no gift." Furthermore, the instruction looks far more appropriate in context, which always must be considered.

■ The court failed to give three instructions suggested by defendant. As to these instructions, defendant gave no ground for his exception when he excepted. Disregarding this failure, the court's choice was correct. One instruction was adequately covered elsewhere. The giving of the instruction would have placed emphasis on certain testimony to which emphasis defendant was not entitled. The other two instructions concerned matters which were not real substantial issues in the case.

■ Lastly, the defendant complains that the indictment was insufficient and, alternatively, that he was entitled to a bill of particulars. In essence, the indictment charged how much taxable income the defendant failed to report each year in question but did not specify the source or detail of particular income omitted. Defendant is barred on this matter by this court's decision upholding a similar indictment in the Himmelfarb case, supra.

On the whole record, it appears that defendant had a fair trial. If there be slight error in the record, it could not have changed the outcome in this case, in this court's view.

Defendant's representation below and here was exceptionally good. Defendant, as most defendants must, made the hard choice as to whether he would take the witness stand. He elected to do so. If his story is true, objectively he almost admits guilt. He pretty well discredited

Biow and he was able to exploit almost without limit the providential (for him) circumstance of Biow's false books.

Primarily this decision rests upon this court's belief that there was no error below, but secondarily it rests upon the conclusion that if there was error in the rulings on any or all of plaintiff's three main contentions [5] then it was harmless under the standards laid down in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. The main debatable issue really was the matter of wilfulness. This the jury, properly instructed, found against Samish.

The defendant has been fairly convicted.

The judgment is affirmed.

5. The subjects of these contentions were:
(a) The references to gambling activities of Samish in the prosecutor's opening statement and the foundation testimony to show gambling activities (later stricken);

(b) Exclusion of some testimony of the witness Lyon which might have further impeached Biow;
(c) The court's instructions which doubtless referred to Biow's books.