HANS P. KRAUS AND HANNI Z. KRAUS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6075-69—6080-69.    Filed February 22, 1973.

---

[1] Proceedings of the following petitioners are consolidated herewith: Hans Peter Kraus, Jr., docket No. 6076-69; Susan L. Kraus, docket No. 6077-69; Eveline D. Rauber, docket No. 6078-69; Herbert Gstalder and Barbara Gstalder, docket No. 6079-69; Mary Ann Mitchell, docket No. 6080-69.

*Martin A. Roeder*, *Harold Manheim*, and *Edward First*, for the petitioners.

*Agatha Vorsanger*, for the respondent.

STERRETT, *Judge:* The Commissioner determined deficiencies in petitioners' Federal income tax for the calendar year 1965 as follows:

| Petitioner | Docket No. | Deficiency |
|---|---|---|
| Hans P. Kraus and Hanni Z. Kraus____ | 6075–69 | $132, 502. 85 |
| Hans Peter Kraus, Jr_____ | 6076–69 | 29, 030. 05 |
| Susan L. Kraus_____ | 6077–69 | 28, 467. 53 |
| Eveline D. Rauber_____ | 6078-69 | 28, 616. 62 |
| Herbert Gstalder and Barbara Gstalder_____ | 6079–69 | 22, 969. 79 |
| Mary Ann Mitchell_____ | 6080–69 | 33, 299. 94 |

Concessions have been made by petitioners Hans P. Kraus and Hanni Z. Kraus,[2] leaving as the sole issue for our determination whether the proceeds from the sale of petitioners' stock in Kraus Reprint, Ltd., a Liechtenstein corporation, are taxable as dividends to the extent provided in section 1248, I. R. C. 1954,[3] or as capital gains. To resolve this issue we must determine whether Kraus Reprint, Ltd., was a controlled foreign corporation within the meaning of section 957(a).

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference.

Petitioners Hans P. and Hanni Z. Kraus, Hans Peter Kraus, Jr., Susan L. Kraus, Eveline D. Rauber, Herbert and Barbara Gstalder, and Mary Ann Mitchell, using the cash basis of accounting, filed their Federal income tax returns for the calendar year 1965 with the district director of internal revenue at New York, N.Y. At the time of the filing of the petitions herein, the petitioners' legal residences were as follows:

---

[2] Hans P. Kraus and Hanni Z. Kraus have conceded that additional partnership income in the amount of $7,280.94 is includable in their gross income. This issue did not relate to the other petitioners.

[3] All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.

| *Petitioner* | *Residence* |
|---|---|
| Hans P. and Hanni Z. Kraus | Ridgefield, Conn. |
| Hans Peter Kraus, Jr | Do. |
| Susan L. Kraus | Do. |
| Eveline D. Rauber | Hamburg, Germany |
| Herbert and Barbara Gstalder | Nendeln, Liechtenstein |
| Mary Ann Mitchell | Fort Lee, N.J. |

In some cases, the spouse of one or more of the petitioners is a petitioner herein solely by reason of having filed a joint Federal income tax return.

Kraus Reprint, Ltd. (hereinafter KRL), is a corporation organized under the laws of Liechtenstein. It was originally organized in April 1962 as Scientific Periodicals Enterprises, Ltd. (hereinafter referred to as Scientific Periodicals), by E.V.D. Wight (hereinafter referred to as Wight), a British citizen and resident of Liechtenstein. Its capital consisted of 100,000 Swiss Francs (hereinafter referred to as Sw Fr), which was divided into 100 common shares, with a par value of Sw Fr 1,000 each, all of which were duly issued. At all times relevant herein the average exchange rate was Sw Fr 4.31 to 1 U.S. dollar. The board of directors were Wight, chairman of the board, Chase C. Achard, and Hans-Ranier Wohlwend.

On or before October 31, 1962, the stock of Scientific Periodicals was acquired by Hans and Hanni Kraus on behalf of themselves and their children, all of whom constitute the petitioners herein. On November 9, 1962, the corporate name was changed to Kraus Reprint, Ltd.

At the extraordinary general meeting of KRL, held on December 12, 1962, the authorized capital was increased to Sw Fr 200,000 represented by 1,000 common shares, in bearer form, each with a par value of Sw Fr 100, and 100 registered 8-percent cumulative preferred shares, each with a par value of Sw Fr 1,000. Ten common shares were entitled to one vote and each preferred share was entitled to one vote. At the same meeting, the articles of incorporation were amended in pertinent part as follows:

Art. 4a. The Management shall keep a Share Register of the owners of registered shares, in which the shareholders shall be listed by name and domicile or by company style and domicile, respectively. In relation to the Corporation there shall be regarded as shareholder with respect to registered shares those who are recorded in the Share Register. Registration shall be effected on the basis of a certification of effected transfer of the share or, in cases of inheritance, upon proof of inheritance, and in cases of dissolutions of corporations upon submission of proof concerning the legal successor. Registration in the Share Register shall be mentioned on the stock certificate. Transfer of registered shares is permitted only with the approval of the Board of Directors. Such approval may be denied on the basis of important reasons.

Upon acquisition pursuant to inheritance, matrimonial regime, execution or bankruptcy, the Board of Directors may deny registration only if the Corporation (pursuant to Art. 306 PGR) or shareholders declare themselves ready to acquire the shares at their real value at the time the application for registration is made. The shareholders are entitled to such acquisitions in proportion to their holdings.

Art. 4b. The preference shares are registered by name and provide for a preferential dividend of 8% per annum. Before any dividend is declared on the regular shares, there must be paid out each year the said preference dividend, namely within two months after the end of the fiscal year. The claim to the preferred dividend is cumulative, preferred dividends not paid out in full must therefore be paid in the following years, before any dividend on the regular shares is declared. So long as the Corporation shall have preferred shares outstanding, open reserves of the Corporation shall be maintained with at least the amount of the then outstanding par value of the preferred capital.

The preferred shares may be repaid by the Corporation to the preferred shareholders recorded in the Share Register after not less than three months' notice by the Corporation.

The shareholders shall have a claim to the par value of the preferred shares plus any past due and current dividends to the day of redemption.

In the event of the liquidation of the Corporation, the preferred shareholders shall have these same rights, namely before the further liquidation proceeds may be paid out to the ordinary stockholders.

Art. 9. The General Meeting shall be regarded as having a quorum when 51% of all the shares are represented. Resolutions of the General Meeting shall be passed by simple majority of the shares voting.

Art. 10. For resolutions concerning the amendments of the articles of incorporation, expansion or restriction of the aims of the business, dissolution or merger of the Corporation with another enterprise, as well as for the liquidation of the Corporation, it shall also be required that 51% of all the shares be represented. If the quorum as stated in Art. 9 is not attained, the Board of Directors may convene another General Meeting not earlier than 14 days after this meeting, at which meeting resolutions such as mentioned in this article may also be adopted if only one third of all the shares is represented, provided that among this one third there shall be present or represented at least one regular share and one preferred share.

The petitioners continued to hold all of KRL's common stock and were at all relevant times U.S. shareholders within the meaning of section 951(b).

On or about December 12, 1962, the newly created preferred shares were acquired by subscription from KRL at their par value by the following persons in the amounts shown:

| Person | Number of shares | Amount | |
|---|---|---|---|
| Emka Foundation | 45 | SwFr | 45, 000 |
| Julia Zeller de Mozer | 10 | | 10, 000 |
| Kurt Winter | 18 | | 18, 000 |
| E. V. D. Wight, Jr | 9 | | 9, 000 |
| Herbert Kingsbury Wight | 9 | | 9, 000 |
| Thiele & Co., A.G. | 3 | | 3, 000 |
| Braunschweig & Cie | 3 | | 3, 000 |
| Jacques Bloch | 3 | | 3, 000 |

The foregoing shares were represented by stock certificates registered in the name of the respective owners.

Emka Foundation (hereinafter referred to as Emka), was organized in Liechtenstein, as a stiftung, in 1947. A stiftung is a creation of the laws of Liechtenstein or Switzerland, resembling a trust, but not limited to specific lives in being. A stiftung can own property and is controlled by an administrator (known as a stiftungerat) whose powers and duties are comparable to a trustee.

Emka was organized by Dr. Alfred Kolb (hereinafter Kolb), a Swiss attorney, pursuant to the direction of certain of his clients. The record does not indicate who were the beneficiaries of Emka. The law of Switzerland prohibits the revealing of such names. Kolb was the legal representative or attorney for Emka. He also performed legal services for other companies owned by petitioner Hans P. Kraus.

Wight, a banker by profession, was the administrator of Emka during all relevant years herein. He was the chief executive officer of KRL from its formation through July 1965, as well as other Liechtenstein corporations owned by Hans and Hanni Kraus. Wight, as administrator, was authorized to attend the stockholders meetings of KRL and to vote any stock owned by Emka.

Kolb was approached by Maxwell Fields (hereinafter referred to as Fields), Hans P. Kraus' accountant, about the availability of certain number of preferred shares in KRL. Kolb caused Emka to purchase its shares because the 8-percent dividend rate was far in excess of State bonds which were 3½ percent.

Julia Zeller de Mozer was a client of Kolb. On or about October 2, 1963, she sold her shares of KRL preferred stock, at par value, to Securities Administration & Trading Co. Establishment (hereinafter SAT). SAT was organized as an "anstalt" under the laws of Liechtenstein sometime prior to 1962. An anstalt is a corporation which may not have its capital owned by more than one individual, similar to a one-man corporation. The entire beneficial interest in SAT was owned by Mrs. Carrie E. Wight (hereinafter Mrs. Wight), a British citizen residing in Liechtenstein and wife of Wight. SAT was operated by a managing director, Chase Archard, and other directors were Kolb and Mrs. Wight. The decision to purchase the aforementioned KRL preferred stock was made by Wight.

E. V. D. Wight, Jr., and Herbert Kingsbury Wight are the children of Wight and Mrs. Wight. Both were British citizens and residents of Liechtenstein, and during the relevant years were minors. Under Liechtenstein law, a minor's father may represent his child at stockholders meetings and vote his child's stock.

Jacques Bloch is a citizen and resident of Switzerland. His family has been close friends of Hans P. Kraus for the past 40 years. During

the relevant years Jacques Bloch was the chief executive officer of Thiele & Co., A. G., and Braunschweig & Cie. Thiele & Co., A. G., is a corporation organized under the laws of Switzerland, whose stock is held equally by Jacques Bloch's father and by Braunschweig & Cie. Braunschweig & Cie is a Swiss partnership owned by Jacques Bloch's father and uncle. Hans P. Kraus was instrumental in getting Jacques Bloch to purchase preferred shares in KRL.

Kurt Winter is a citizen of the United States. He is a first cousin of Hanni Kraus and a friend of Hans Kraus. Winter was approached by Fields about the purchase of KRL preferred, along with other available stock in Kraus-owned corporations.

As of December 12, 1962, the board of directors of KRL were Wight, Wohlwend, and Achard. On January 9, 1963, petitioner Mary Ann Mitchell (formerly Kraus) was elected a director, and on January 29, 1963, Wohlwend resigned. On August 19, 1963, Wight, Achard, and Mary Ann Kraus, were reelected as directors and Hans P. Kraus, and Prince Heinrich of Liechtenstein were elected to the board of directors, all for 1-year terms.[4] At the meeting of July 17, 1964, all the above were reelected for additional 1-year terms.

The minutes of the meeting held on July 17, 1964, reflected the following:

As *to Item 4*. The chairman points out that the issuance of preferred stocks has increased the number of shareholders considerably and that the single publication of Summonses, invitations and announcements in the "Liechtensteiner Vaterland" is not sufficient in order to make sure that all stockholders receive the necessary information in connection with the development of the corporation. The Board of Directors therefore motions the change of Art. 5 of the Articles of Incorporation as follows:

5. All summonses, invitations and announcements of the Corporation to the holders of common stock are done by registered mail to them or by notification through the "Liechtensteiner Vaterland".

All summonses, invitations and announcements of the corporation to the holders of preferred stocks are done by registered letter to the address of the holders of preferred stock, last registered in the stockbook (§ 4 a)

The chairman motions the approval of this new wording for article 5 of the Articles of Incorporation. This motion is approved unanimously.

The articles of incorporation were further amended as follows:

Article 10. For resolutions on changes of Articles of Incorporation, change corporative capital, repayment of preferred shares pursuant to article 4b Para 2, broadening or narrowing the scope of business, dissolution or merger of the corporation with another enterprise, and liquidation of the corporation, it shall also be required that 51% of all shares be represented. Should the quorum mentioned in article 9 not be reached, the Board of Directors may, at the

---

[4] Chase Achard resigned from the board on Dec. 16, 1964, but was reelected on Apr. 7, 1965.

earliest after 14 days have elapsed since this meeting, call a new stockholders meeting at which the resolutions mentioned in this Paragraph may be adopted even if only one-third of all shares be represented, provided, however, that at least one common share and one registered share shall be present or represented in such one-third.

The provisions of the preceding paragraph shall not apply to resolutions of the stockholders meeting concerning repayment of preferred shares pursuant to Art. 4b, Para 2.

On April 1, 1965, all the preferred shares were sold to Bank Und Finanz Institut, A. G. (hereinafter Bank Und Finanz), at their par value. The transfer of these shares was approved by the board of directors of KRL. The record does not indicate where Bank Und Finanz was organized, nor is there any evidence concerning the nationality or citizenship of any of its stockholders.

Following the issuance of the preferred stock, the stockholders of KRL met on the following dates with the indicated percentage of represented stockholders:

| Meeting | Percentage of common shares in attendance | Percentage of preferred shares in attendance |
|---|---|---|
| Aug. 19, 1963 | 100 | 63 |
| July 17, 1964 | 100 | 100 |
| Dec. 7, 1964 | 100 | 81 |
| Apr. 6 1965 | 100 | 100 |
| July 2, 1965 | 100 | 100 |

The minutes of the meetings of August 19, 1963, and July 17, 1964, do not indicate whether the shareholders appeared in person or by proxy. At the meeting of December 7, 1964, Wight represented the 45 shares held by Emka Foundation and the 18 shares held by his sons. Dr. Alois Ritter, counsel to KRL and other Kraus corporations in Liechtenstein, represented the 18 preferred shares owned by Kurt Winter. Fields served as proxy for all the common shares.

The April 6, 1965, meeting of KRL found Hans P. Gerber, a director of Bank Und Finanz, representing its 73 shares. Jacques Bloch represented 9 shares, and Fields represented 18 owned by Kurt Winter.[5] The common shareholders were represented by Hans P. Kraus.

At the July 2, 1965, meeting, Bank Und Finanz authorized Otto Zucker and Harold Manheim to represent and vote its preferred shares. Zucker and Manheim were partners in the New York law firm of Wachtell, Manheim & Grouf, and during the years 1962 through 1965 were Hans P. Kraus' regular attorneys. At this meeting the charter of KRL was amended to authorize, among other things, a split of the 100

---

[5] The stipulation of facts and KRL's stock ledger indicate that Bank Und Finanz purchased all the preferred stock on Apr. 1, 1965. This is not in accord with the minutes of the meeting on Apr. 6, 1965, which noted the appearances of Jacques Bloch and Fields as proxy for Kurt Winter, representing their respective shares.

preferred shares into 1,000 preferred shares at a par value of SwFr 100.

The petitioners agreed, on July 16, 1965, to sell 51 percent of their common stock in KRL, as well as 51 percent of their stock in Kraus Reprint Corp., a domestic corporation, to Thomson International Corp., Ltd. (hereinafter Thomson), a corporation organized under the laws of Ontario. The agreement states further, in pertinent part, as follows:

Section 5. *Purchase of Preferred Stock of Kraus Reprint Limited.*

5.1 Mr. Kraus and Mrs. Kraus agree that:

(a) They will cause the owner of all of the outstanding preferred stock of Kraus Reprint Limited to sell 51% of such stock to Thomson, concurrently with the Closing, at an aggregate price not exceeding 52,020 Swiss francs plus an amount equal to the dividends accrued and unpaid thereon at the rate of 8% per annum from November 30, 1964 to the Closing Date; and

(b) They will buy the remaining 49% of such preferred stock from such owner at the same time and at the same price and terms as Thomson.

5.2 Mr. Kraus and Mrs. Kraus jointly and severally represent and warrant to Thomson that:

(a) All of such preferred stock is validly issued, fully paid and non-assessable and has not been called for redemption;

(b) Upon payment for shares of such preferred stock at the Closing Thomson will acquire good and valid title thereto, free and clear of any liens, claims, options, charges or encumbrances; and

(c) The changes in ownership of such preferred stock contemplated by this Section 5 will not violate any provision of the statutes of Kraus Reprint Limited or any provision of, or result in the acceleration of any obligation or the loss of any rights under, any mortgage, lien, lease, agreement, instrument, order, arbitration award, judgment or decree to which such Corporation is a party or by which it is bound and will not violate or conflict with any other restriction of any kind or character to which such Corporation is subject or violate any agreement or restriction of any kind to which such Corporation or any of the Shareholders or the owner of such preferred stock is a party or by which it or any of them is bound.

5.3 Thomson agrees to buy 51% of the outstanding preferred stock of Kraus Reprint Limited from the owner thereof, concurrently with the Closing, at the price specified in Section 5.1, subject to fulfillment of the conditions of closing specified in Section 8.

5.4 Mr. Kraus and Mrs. Kraus jointly and severally agree to indemnify Thomson against and hold it harmless from all damages, losses and expenses arising out of any breach of warranty or inaccurate or erroneous representation made in Section 5.2.

5.5 The provisions of this Section 5 are not intended for the benefit of and shall not be enforceable by or on behalf of any person other than the parties hereto and their respective successors and assigns.

The petitioners sold such portion of their common stock on July 30, 1965, realizing a gain which was reported on their respective tax returns as follows:

| Petitioner | Number of common shares sold | Cost basis | Proceeds of sale | Long-term gain |
|---|---|---|---|---|
| Hans P. and Hanni Z. Kraus (joint return) | 220 | $29,304.83 | $1,472,070.15 | $1,442,765.32 |
| Hans Peter Kraus, Jr | 58 | 8,386.09 | 388,091.34 | 379,705.25 |
| Susan L. Kraus | 58 | 8,386.09 | 388,091.34 | 379,705.25 |
| Eveline D. Rauber | 58 | 8,386.09 | 388,091.34 | 379,705.25 |
| Herbert and Barbara Gstalder (joint return) | 58 | 8,386.06 | 388,091.34 | 379,705.28 |
| Mary Ann Kraus | 58 | 8,386.06 | 388,091.34 | 379,705.28 |

The earnings and profits of KRL accumulated between December 31, 1962, and July 30, 1965, attributable to the common shares sold by petitioners were as follows:

| Petitioner | Allocable earnings and profits as of July 30, 1965 |
|---|---|
| Hans P. Kraus and Hanni Z. Kraus | $353,227.62 |
| Hans Peter Kraus, Jr | 93,123.64 |
| Susan L. Kraus | 93,123.64 |
| Eveline D. Rauber | 93,123.64 |
| Herbert Gstalder and Barbara Gstalder | 93,123.64 |
| Mary Ann Mitchell (formerly Mary Ann Kraus) | 93,123.64 |

Also on July 30, 1965, Bank Und Finanz sold 510 preferred shares of KRL to Thomson for a total price of Sw Fr 54,739.83 or approximately $12,700. On the same day, Bank Und Finanz sold the remaining preferred shares in KRL to Hans P. and Hanni Z. Kraus, and the parties executed the following agreement.

AGREEMENT FOR THE PURCHASE AND SALE OF PREFERRED STOCK

BANK UND FINANZ–INSTITUT AG. hereby agrees to sell to HANS P. KRAUS and to HANNI KRAUS and HANS P. KRAUS and HANNI KRAUS each hereby agrees to purchase, on the date hereof, 245 shares of the preferred stock of KRAUS REPRINT LIMITED, a Liechtenstein corporation, each for a total price of 26,317.12 Swiss francs.

HANS P. KRAUS agrees to reimburse BANK UND FINANZ–INSTITUT AG. for all stock transfer taxes levied in connection with this sale and the sale of even date to THOMSON INTERNATIONAL CORPORATION LIMITED.

DATED: July 30, 1965

BANK UND FINANZ–INSTITUT AG

By: (Signed) Harold Manheim

HAROLD MANHEIM; Attorney-in-Fact

(Signed) Hans P. Kraus

HANS P. KRAUS

(Signed) Hanni Kraus

HANNI KRAUS

The consideration paid by Hans P. and Hanni Kraus to Bank Und Finanz amounted to approximately $12,210.

KRL's financial picture was as follows:

| FYE Nov. 30— | Profit | Cash, bank balance post checks | Net worth |
|---|---|---|---|
| 1962 | Sw Fr 978,229.89 | Sw Fr 218,454.50 | Sw Fr 1,078,229.89 |
| 1963 | Sw Fr 2,210,437.58 | Sw Fr 677,911.82 | Sw Fr 3,380,667.47 |
| 1964 | Sw Fr 3,764,781.33 | Sw Fr 2,159,113.35 | Sw Fr 7,137,448.80 |
| 1965 | $1,217,014.20 | $812,453.08 | $2,788,538.18 |

Hans P. Kraus has engaged directly and indirectly in the periodical reprint and rare books business for many years. During 1962 and until 1965, he and his family owned substantial interests in the stock of the following corporations:

| Name | Business |
|---|---|
| Kraus Reprint, Ltd. | A Liechtenstein corporation which maintained its plant and offices in Nendeln, Liechtenstein, and reprinted and sold foreign out-of-print, materials not available in sufficient quantities in the secondhand market. |
| Kraus Reprint Corp. | A domestic corporation which engages in the same business as Kraus Reprint, Ltd., with respect to domestic materials. |
| Kraus Periodicals Corp., Ltd. | A Liechtenstein corporation which acquired and sold foreign secondhand material similar to that reprinted by Kraus Reprint, Ltd. This corporation however carries very few copies or even only one. Thus its inventory covers a wider range of titles and items of more specialized interest. |
| Kraus Periodicals, Inc. | A domestic corporation engaged in the same business as Kraus Periodicals Corp., Ltd., in the domestic market. |
| Back Issues Corp. | A domestic corporation engaged in the same business as Kraus Periodicals, Inc. |
| Rare Books, Ltd. | A Liechtenstein corporation engaged in the purchase and sale of rare books principally in Europe. |
| Kraus Co., Ltd. | A Liechtenstein corporation engaged in the same business as Rare Books, Ltd. |

Hans and Hanni were also equal partners in H. P. Kraus, a U.S. partnership engaged in the same business as Rare Books, Ltd.

At the end of 1962, or the beginning of 1963, the Kraus-owned Liechtenstein corporations were recapitalized by the issuance of voting preferred stock. Said voting preferred stock was subscribed to by some of the preferred shareholders of KRL, including Kurt Winter, Emka, SAT, E.V.D. Wight, Jr., and Herbert Kingsbury Wight.

Although Emka, SAT, E.V.D. Wight, Jr., and Herbert Kingsbury Wight sold their shares of KRL preferred stock, they did not sell the preferred stock of other Kraus-owned corporations.

Hans P. Kraus was in the courtroom at the time of trial in the instant case, but was not called to testify. No employee, officer, or director of KRL during 1962 through 1965, or of Bank Und Finanz, was called to testify. Wight died on May 10, 1970, and Maxwell Fields died sometime in 1970.

### OPINION

Petitioners owned 100 percent of KRL, a foreign corporation organized under the laws of Liechtenstein. On December 12, 1962, the articles of incorporation were amended to authorize the issuance of 100 registered 8-percent cumulative preferred shares, par value Sw Fr 1,000 each, with voting power equal to that of the common shares held by the petitioners. The preferred shares were acquired by subscription immediately thereafter. In 1965, the petitioners sold 51 percent of their common stock in KRL to Thomson, a Canadian corporation, and realized gains in the following amounts:

| Petitioner | Gain |
|---|---|
| Hans and Hanni Kraus | $1,442,765.32 |
| Hans Peter Kraus, Jr | 379,705.25 |
| Susan L. Kraus | 379,705.25 |
| Eveline D. Rauber | 379,705.25 |
| Herbert and Barbara Gstalder | 379,705.28 |
| Mary Ann Mitchell | 379,705.28 |

The sole issue for our determination is whether any part of the gain realized must be treated as a dividend under the provisions of section 1248.

Section 1248(a) provides:

SEC. 1248. GAIN FROM CERTAIN SALES OR EXCHANGES OF STOCK IN CERTAIN FOREIGN CORPORATIONS.

(a) GENERAL RULE. — If —

   (1) a United States person sells or exchanges stock in a foreign corporation, or if a United States person receives a distribution from a foreign corporation which, under section 302 or 331, is treated as an exchange of stock, and

   (2) such person owns within the meaning of section 958(a), or is considered as owning by applying the rules of ownership of section 958(b), 10 percent or more of the total combined voting power of all classes of stock entitled to vote of such foreign corporation at any time during the 5-year period ending on the date of the sale or exchange when such foreign corporation was a controlled foreign corporation (as defined in section 957),

then the gain recognized on the sale or exchange of such stock shall be included in the gross income of such person as a dividend, to the extent of the earnings and profits of the foreign corporation attributable (under regulations prescribed by the Secretary or his delegate) to such stock which were accumulated in taxable years of such foreign corporation beginning after December 31, 1962, and during the period or periods the stock sold or exchanged was held by such person while such foreign corporation was a controlled foreign corporation.

The petitioners are U.S. persons (as defined in section 957(d)), each owning at least 10 percent of the combined voting power of all classes of stock in KRL. The amount of earnings and profits allocable to each petitioner is stipulated as follows:

| Petitioner | Earnings and profits |
|---|---|
| Hans P. and Hanni Z. Kraus | $353,227.62 |
| Hans Peter Kraus, Jr | 93,123.64 |
| Susan L. Kraus | 93,123.64 |
| Eveline D. Rauber | 93,123.64 |
| Herbert and Barbara Gstalder | 93,123.64 |
| Mary Ann Mitchell | 93,123.64 |

The application of section 1248 will therefore turn on whether KRL was a "controlled foreign corporation," as defined in section 957(a), during the period following December 31, 1962, and running through July 30, 1965.

Section 957(a) defines a "controlled foreign corporation" as:

(a) GENERAL RULE.—* * * any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock entitled to vote is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b), by United States shareholders on any day during the taxable year of such foreign corporation.

It is apparent that the petitioners have attempted to comply with or, to state it more accurately, have attempted to avoid the effect of, the literal language of section 957(a). After the issuance of the preferred stock in KRL, not more than 50 percent of the formal voting power was held as record owners by U.S. shareholders (as defined in section 951(b)).[6] However it is clear from our recent decision in *Garlock Inc.*, 58 T.C. 423 (1972), on appeal (C.A. 2, Aug. 31, 1972), that mere technical compliance with the statute is not sufficient. Rather, we must determine whether the substance of the transaction was that which the statute intended, specifically a meaningful transfer of 50 percent of the voting power in KRL by the petitioners. Cf. *Knetsch* v. *United States*, 364 U.S. 361 (1960); *Griffiths* v. *Commissioner*, 308 U.S. 355 (1939); *Gregory* v. *Helvering*, 293 U.S. 465 (1935). The courts have often recharacterized purported sales by looking to the realities of the situation. *Higgins* v. *Smith*, 308 U.S. 473 (1940); *Atkins* v. *Commissioner*, 76 F. 2d 387 (C.A. 5, 1935); *Clarence L. Hook*, 58 T.C. 267 (1972).

---

[6] Kurt Winter, an American citizen and a purchaser of preferred stock, owned 9 percent of the voting power in KRL, and was therefore not a U.S. shareholder, which requires 10-percent ownership.

Sec. 951(b) reads as follows:

UNITED STATES SHAREHOLDER DEFINED.—For purposes of this subpart, the term "United States shareholder" means, with respect to any foreign corporation, a United States person (as defined in section 957(d)) who owns (within the meaning of section 958(a)), or is considered as owning by applying the rules of ownership of section 958(b), 10 percent or more of the total combined voting power of all classes of stock entitled to vote of such foreign corporation.

We have no doubt that the effects of being classified as a controlled foreign corporation have caused many U.S. shareholders to divest themselves of enough voting power to avoid section 957(a). There is clearly nothing improper about such a purpose for the divestiture. However, we must closely scrutinize such sales to be certain that the requisite voting power no longer exists with U.S. shareholders, especially when transferred by shareholders in a closely held corporation to friends, relatives, and employees. Cf. *R. E. L. Finley*, 27 T.C. 413 (1956), affd. 255 F. 2d 128 (C.A. 10, 1958). The reality of the transaction is ascertained from all the facts and circumstances of each case. *Wilson Athletic Goods Mfg. Co.* v. *Commissioner*, 222 F. 2d 355 (C.A. 7, 1955), reversing a Memorandum Opinion of this Court; *Ollie G. Rose*, 56 T.C. 185 (1971).

After a comprehensive analysis of the evidence in the instant case, we are of the opinion that the petitioners did not divest themselves of any meaningful voting power in KRL.

The articles of incorporation of KRL protected the petitioners' position of control. Notably, the preferred stock was issued subject to several substantial restrictions. First the stock was not transferable, even by act of law, without the express approval of the board of directors. Second, the board of directors could authorize the redemption of any or all of the preferred shares on 3 months' notice. Lastly, the preferred shares, issued at par, could be redeemed only at par value. It is no exaggeration to say that the preferred stock existed at the whim of the corporation. On the other hand, the common shares were issued without restrictions. Furthermore the articles made no provision for the settlement of shareholder deadlocks.

The net result is that the preferred shareholders had neither a substantial economic interest nor any true voting power in KRL. In the unlikely event that the preferred shareholders decided jointly to exercise their votes against the petitioners in an election of the board of directors, a deadlock would occur. Assuming that Liechtenstein law is similar to most State law in the area,[7] the present board of directors would remain in power until successors were elected. At the time the preferred shares were issued, KRL had a board of directors owing their allegiance to the petitioners. Ouster of this board by the preferred alone was impossible. The board could continue to function as directed by the petitioners, and could call for redemption of the dissident preferred shareholder's stock.[8]

---

[7] See, for example, N. Y. Bus. Corp. Law sec. 703 (McKinney 1963), and Model Bus. Corp. Act. sec. 36. The petitioner has not demonstrated the law to be otherwise and he has the burden of proof. Rule 32, Tax Court Rules of Practice.

[8] The articles of incorporation were amended on July 17, 1964, to require a majority vote of at least 51 percent of all shares to cause a redemption of any preferred stock. We note that this amendment was not in effect from Dec. 12, 1962, the date the preferred shares were issued, through July 17, 1964. This formal requirement did little to change the character of the petitioners' control over the corporation and the board of directors.

Moreover there was little probability of any real participation by the preferred shareholders. Because the preferred stock could be redeemed only at par value, the preferred shareholders had no opportunity to share in KRL profits, other than in the form of an annual 8-percent dividend. Rather than engage in an expensive battle for control, a preferred shareholder would be more likely to volunteer redemption and seek a more beneficial investment.

In accord with the above, the evidence does not indicate any active participation in the management of KRL by the preferred shareholders. The board of directors remained basically unchanged throughout all relevant periods, with the exception of adding petitioners Hans P. Kraus and Mary Ann Mitchell to the board. Though Prince Heinrich of Liechtenstein also served on the board for a period of time, we have not been informed of the purpose for which he was elected. Furthermore, only one preferred shareholder attended a shareholders meeting by other than proxy, that being Jacques Bloch. The one meeting he attended took place on April 6, 1965. Both the stipulation of facts and the KRL stock ledger indicate Jacques Bloch sold his shares on April 1, 1965.

We are well aware that with a highly successful, closely held corporation, the owners would be apt to sell shares to friends, relatives, and employees undisposed to question corporate policy. However, what is not present in the instant case is any opportunity for the preferred shareholders to alter the course of events, even if they suddenly became so inclined. Further, while we recognize that preferred stock restrictions similar to the ones in the instant case are quite common, they are normally used to protect control of the corporation, which is not inconsistent with our findings herein.

Our conclusion with respect to the legal effect of the restrictions on the preferred stock is buttressed by the commonsense realization that the 100-percent owners, small in number of a corporation with a net worth of $250,169.34, annual profits in excess of $226,967.49,[9] would not be likely to surrender control, or run any substantial risk thereof, of their corporation to new shareholders making a total capital contribution of $24,900. Even strict construction of a statute does not require us to assume the propensities of an ostrich by ignoring the meaningless nature of a mere literal compliance with statutory requirements.

---

[9] It is interesting to note that the net worth and profits of KRL cited above are for the first year of the relevant period and that they both increased dramatically in succeeding years as follows:

| FYE Nov. 30— | Net worth | Profit |
| --- | --- | --- |
| 1962 | $250,169.34 | $226,967.49 |
| 1963 | 784,377.60 | 512,862.54 |
| 1964 | 1,656,020.60 | 873,499.14 |
| 1965 | 2,788,538.18 | 1,217,014.20 |

The control the petitioners maintained over KRL and the preferred stock is even more obvious when we view the petitioners' sale of 51 percent of their common stock to Thomson. Prior to the petitioners' sale, all the preferred shareholders simultaneously sold their stock at par value to Bank Und Finanz.[10] Later in petitioners' agreement of sale with Thomson, section 5 stated:

Section 5. *Purchase of Preferred Stock of Kraus Reprint Limited.*

5.1 Mr. Kraus and Mrs. Kraus agree that:

(a) They will cause the owner of all of the outstanding preferred stock of Kraus Reprint Limited to sell 51% of such stock to Thomson, concurrently with the Closing, at an aggregate price not exceeding 52,020 Swiss francs plus an amount equal to the dividends accrued and unpaid thereon at the rate of 8% per annum from November 30, 1964 to the Closing Date; and

(b) They will buy the remaining 49% of such preferred stock from such owner at the same time and at the same price and terms as Thomson.

From this agreement and other facts noted above, we hold that the issuance of voting preferred stock by KRL was merely a device used to give the appearance of mechanical compliance with section 957(a), without a substantive change in the voting power.

Section 1.957–1(b) (2), Income Tax Regs., states:

(2) *Shifting of formal voting power.* Any arrangement to shift formal voting power away from United States shareholders of a foreign corporation will not be given effect if in reality voting power is retained. The mere ownership of stock entitled to vote does not by itself mean that the shareholder owning such stock has the voting power of such stock for purposes of section 957. For example, if there is any agreement, whether express or implied, that any shareholder will not vote his stock or will vote it only in a specified manner, or that shareholders owning stock having not more than 50 percent of the total combined voting power will exercise voting power normally possessed by a majority of stockholders, then the nominal ownership of the voting power will be disregarded in determining which shareholders actually hold such voting power, and this determination will be made on the basis of such agreement. * * * [11]

We think this accurately stresses one of the foremost axioms of tax law, that is, substance controls rather than form. In the instant case, we feel that all the facts and circumstances indicate that there was no intention to divest the petitioners of 50 percent of the voting

---

[10] There is no evidence in the record concerning Bank Und Finanz and its relation to the petitioners. For this additional reason, we would hold KRL a controlled foreign corporation at least from Apr. 1, 1965, forward, the date of sale to Bank Und Finanz.

[11] Sec. 1.957–1(b) (2), Income Tax Regs. :

Moreover, where United States shareholders own shares of one or more classes of stock of a foreign corporation which has another class of stock outstanding, the voting power ostensibly provided such other class of stock will be deemed owned by any person or persons on whose behalf it is exercised or, if not exercised, will be disregarded if the percentage of voting power of such other class of stock is substantially greater than its proportionate share of the corporate earnings, if the facts indicate that the shareholders of such other class of stock do not exercise their voting rights independently or fail to exercise such voting rights, and if a principal purpose of the arrangement is to avoid the classification of such foreign corporation as a controlled foreign corporation under section 957.

power in KRL. However, we do not pass on whether the tests further elucidated in section 1.957–1(b)(2), as quoted in footnote 11, are sufficient, in and of themselves, to find that voting power was retained.

We note in conclusion that petitioner Hans P. Kraus, though present in the courtroom, failed to testify. We must infer that his testimony would have been unfavorable to the petitioners' case. Clearly, Hans P. Kraus was not practically available to the respondent as a witness. *Kean* v. *Commissioner*, 469 F. 2d 1183 (C.A. 9, 1972), affirming in part and reversing in part 51 T.C. 337 (1968) ; *Samish* v. *United States*, 223 F. 2d 358 (C.A. 9, 1955). Further there was no testimony from any director, officer, or employee of KRL concerning the reasons surrounding the issuance of preferred stock. Thus, any further doubts we might have as to the nature of this transaction must be resolved against the petitioner because he has not adequately satisfied his burden of proof.

We therefore hold that the petitioners never intended to part with any voting control in KRL, nor did the preferred shareholders intend to use the voting power nominally carried by their stock. To hold that the petitioners had carried out the spirit of section 957(a) in the instant case would severely emasculate the effectiveness of the statute.

*Decision will be entered for the respondent.*