UNITED STATES of America,
Appellee,

v.

Ronald F. CALVERT, Appellant.

No. 74–1716.

United States Court of Appeals,
Eighth Circuit.

Submitted June 12, 1975.

Decided Aug. 25, 1975.

Rehearing and Rehearing En Banc
Denied Sept. 24, 1975.

Certiorari Denied Feb. 23, 1976.
See 96 S.Ct. 1106.

Irl B. Baris, St. Louis, Mo., for appellant.

Terence M. Brown, Appellate Section, Crim. Div., Dept. of Justice, Washington, D. C., for appellee.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

Defendant Ronald Calvert was convicted by a jury on seven counts of mail fraud in violation of 18 U.S.C. § 1341, four counts of fraud by wire in violation

of 18 U.S.C. § 1343, and one count of conspiring to commit mail and wire fraud in violation of 18 U.S.C. § 371. The District Court sentenced him to a total of forty-five years imprisonment. We affirm.

Viewed in the light most favorable to the government, the evidence established the following facts. In the spring of 1972, the defendant approached an old acquaintance, Charles Hintz, and asked Hintz if he were interested in going "into business" with him. In a series of meetings, the defendant informed Hintz that he wished to use Hintz as a "front man" in a scheme in which they would enter into a partnership with a businessman with an idea or invention, obtain key man and accidental death insurance on the businessman, and then cause his death for the purpose of collecting and sharing the proceeds. The defendant informed Hintz that he needed a "front man" because he had successfully used this ruse before and, hence, could not have his name listed as beneficiary on the policies. Hintz accompanied the de-

fendant to several meetings with at least three potential business partners. During the process of sizing up these prospects, the defendant stressed to Hintz the health and insurability of the potential partner, stating that business acumen and the merits of the potential partner's product were not the most important considerations. By late spring of 1972, Hintz dropped out of the picture as a "front man." [1]

On May 24, 1972, the defendant's father, James Calvert, entered into a partnership agreement with Victor Null, an inventor who had designed a rotary engine and who was looking for financial backing. Under the partnership agreement, James Calvert was to supply the necessary funds and Null was to develop the engine. The partnership leased office space in East St. Louis, and Null began work there on a prototype.

During the next few months, the defendant obtained insurance policies on the life of Null with a total face value in excess of two million dollars. [2] The de-

1. In August of 1972, Hintz informed law enforcement officials that he believed that the defendant was involved in a scheme to defraud insurance companies.

2. In May, 1972, the defendant contacted a local agent for Prudential Insurance Company and filled out an insurance application seeking $500,000 coverage on Null's life with James Calvert as the beneficiary. The defendant delivered a check for more than $10,000, signed by his father. The Prudential office in St. Louis mailed the application and medical examination forms to the home office in Houston [Count 1]. Before the check was deposited, the defendant contacted the local agent and declared that he wanted to add accidental death benefits. The agent informed the defendant that this was more than Prudential normally writes in accidental death, and that he would have to check with the home office in Houston. A new check was delivered to replace the prior one. The local office then mailed a letter to Houston advising the home office of the change in the application [Count 2]. The local agent learned that Prudential would not authorize such a large policy, and informed the defendant of this fact. The defendant then asked the agent to withdraw the application, because he did not want the application to be rejected. This was done.

The defendant thereafter met with a local agent for New England Mutual. The agent informed the defendant that the application would have to be accompanied by a letter containing information on the partnership, that both would have to be sent to underwriters, and that there were no underwriters in St. Louis. Such a letter was mailed to the home office in Massachusetts on July 10, 1972 [Count 3]. In analyzing the application, New England relied on the financial stability of the defendant's father; the defendant had deposited money into one of his father's bank accounts to bolster the appearance of stability. On July 19, 1972, the local agent received a mailgram from the New England home office, approving $150,000 business and $100,000 personal insurance on the life of Null [Count 4]. The local agent informed the defendant that New England had approved these lesser amounts, rather than the $500,000 requested, and that an application from Null himself would be needed for the personal insurance. The defendant subsequently accompanied Null to the local office, where the latter submitted an application for personal insurance in the amount of $100,000, with an accidental death benefit of $100,000. At the same time, Null assigned the personal policy to James Calvert. This assignment was apparently not known to the home office until September. The premi-

fendant's father, James Calvert, became the beneficiary on two policies, worth $350,000 in the event of accidental death, but the premiums came from the defendant's funds by indirection. An additional $2,000,000 policy was owned by the partnership, and designated the partnership as beneficiary.

On November 1, 1972, the defendant went to the home of an acquaintance of twenty-five years, John Alsop, and offered to pay Alsop $5,000 if he would murder an inventor in East St. Louis. The defendant told Alsop that the inventor's wife wanted some "policies" cancelled, and that he wanted the inventor killed in the near future during a time when the defendant would be in Florida. The defendant stated that he wanted Alsop to go over to the East St. Louis office early one morning and shoot the inventor in the head several times with a .22 or .25 caliber pistol, making it look "like it was done by one of the local colored persons." When Alsop balked, the defendant asked him to think it over. The next day, the defendant called from the partnership premises in Illinois to Alsop's residence in Missouri and asked Alsop if he had made up his mind.[3] Alsop declined the offer, informing the defendant that it was not a question of money,

but that he had a young daughter and wanted to "see her grow up."

On November 9, 1972, two days after the defendant had gone to Florida, Null's body was found in his East St. Louis workshop. He had been shot four times in the head with a .22 caliber firearm. There were no signs of forced entry, and nothing was reported missing, although the office had the appearance of having been ransacked. The murderer has never been found. Shortly after the murder, the defendant told Hintz to warn Alsop to keep his mouth shut if he did not wish to see his (Alsop's) daughter harmed. Subsequently, the defendant offered to give Hintz $100,000 tax-free "from our policy" if he would corroborate the defendant's deposition testimony to the effect that Hintz had expressed an interest in acquiring the engine.

I. AUTHORITY OF THE SPECIAL ATTORNEYS TO PRESENT THE CASE TO THE GRAND AND PETIT JURIES.

There is no merit to the defendant's contention, raised for the first time more than six months after conviction, that the prosecuting attorneys were without authority to present the case to the grand and petit juries. Any objec-

um check was signed by James Calvert. On July 24, 1972, the local agent mailed a letter to the home office in Massachusetts, advising them that the premium had been collected, and forwarding the application for personal insurance signed by Null [Count 5]. On September 1, 1972, the assignment and change of beneficiary form which Null had signed in the defendant's presence was mailed to the home office [Count 6].

On July 24, 1972, a new partnership agreement was reached, bringing in several new partners, including an attorney and a C.P.A. In early September, a separate agreement was signed by all the partners stating that the New England insurance belonged exclusively to James Calvert.

In August of 1972, the defendant contacted Bowes & Company, an insurance broker, and asked if it would consider writing a $2,000,000 accident policy on the inventor, with the partnership as the beneficiary. The company replied that it did not have authority to write such a policy, but that it would accept an application and submit it to qualified under-

writers. The defendant filled out an application, prominently labeled "Lloyds London," and was told by company representatives that the application would be airmailed to London with a request for a "telex" reply. A letter and application were mailed to London [Count 7]. Upon receiving a telex reply from London, Bowes & Company sent a letter on September 8, 1972, to the partnership's attorney, with a copy to the defendant, informing them of the cost of the insurance and asking for confirmation of the order [Count 8]. On September 11, the defendant called Bowes & Company and told it to submit a firm order. The defendant was advised that a reply would be sent by telex to London, and the reply was sent [Count 9]. On September 13, Bowes & Company received a telex from London indicating "bound coverage" [Count 10].

3. The interstate telephone call was the basis of Count 11. Telephone company records were introduced to establish that a call had been placed by an unknown party from the East St. Louis partnership office to Alsop's home in the early afternoon of November 2, 1972.

tions to the validity of the indictment were waived when they were not presented by motion before trial. *See* Federal Rule of Criminal Procedure 12(b)(2); *Davis v. United States*, 411 U.S. 233, 236–237, 241, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973). Even were we to relieve the defendant from the consequences of his waiver, we have squarely rejected the proposition that the type of authorizing letter employed here is insufficient to empower special attorneys of the Justice Department to conduct grand jury proceedings. *United States v. Wrigley*, 520 F.2d 362 (8th Cir. 1975); *United States v. Agrusa*, 520 F.2d 370 (8th Cir. 1975); *Di Girlomo v. United States*, 520 F.2d 372 (8th Cir. 1975). *Accord, In re Grand Jury Subpoena of Persico*, 522 F.2d 41 (2nd Cir. 1975).

## II. PUBLICITY.

█ The defendant argues that he was deprived of a fair trial because of publicity occurring both before and during the trial.[4] While he has submitted a package of newspaper articles to this Court, he does not specify the manner in which they prejudiced him. On this appeal, he points to no instance in which the news accounts were anything other than factual, and he cites no instances in which the accounts went beyond the evidence presented to the jury. *Compare United States v. Pomponio*, 517 F.2d 460 (4th Cir. 1975) (defendant demonstrated that specific newspaper articles contained in-court items from which the jury had been excluded). The defendant did not request a sequestered jury. He

4. Prior to the return of the indictment, a radio and television station each indicated during news broadcasts that an indictment was imminent. Neither broadcast indicated who would be indicted. When the defendant sought to force disclosure of the source of this information, the trial court quashed the subpoena in the face of the newsmen's statement to the court that they would not comply. The defendant does not specify any prejudice stemming from the leak or from the quashing of the subpoena, but he implies that the indictment might have been dismissed if it were discovered that the source of the leaks was a Strike Force Attorney.

does not contend that the voir dire was in any respect inadequate, that any particular juror should have been stricken, or that any juror violated the court's repeated admonitions to avoid all news accounts of the trial. In short, his allegation of unfair publicity is limited to the general allegation that the media coverage was so pervasive as to create an "atmosphere" in which a fair trial was denied.

█ We have held on the issue of trial publicity, that

\* \* \* [e]ventually each case must be decided on the facts, and ordinarily the defendant has the burden of showing any essential unfairness in the adjudicatory process unless the totality of the circumstances raises the probability of prejudice. \* \* \*

*United States v. McNally*, 485 F.2d 398, 402 (8th Cir. 1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1974) (footnote omitted). We are convinced that the totality of the circumstances here do not raise the probability of prejudice. The trial judge instructed the attorneys not to add to the publicity with leaks, instructed the marshals to prevent pictures from being made of witnesses, ordered photographers to stay away from the area around the jury room, refused to provide the media with the names of the jurors, granted the defendant's request that portions of the transcript dealing with matters not occurring in open court be suppressed, and interrogated the jury to determine if any juror had disregarded his instructions to shun media coverage.

Assuming arguendo that the trial court abused its discretion in quashing the subpoena, and assuming that a Strike Force Attorney was indeed the source of the leak, we perceive no prejudice to the defendant stemming from the news report. In the absence of prejudice, the drastic sanction of dismissal of the indictment would not have been appropriate. *Cf. United States v. Abbott Laboratories*, 505 F.2d 565, 570–573 (4th Cir. 1974). Hence, the trial court's handling of the subpoena does not furnish grounds for reversal of the conviction.

The defendant is not persuasive in his attempt to analogize the atmosphere of his trial to that in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), and *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). As the Supreme Court recently noted, each of those cases involved convictions which had been "obtained in a trial atmosphere that had been utterly corrupted by press coverage." *Murphy v. Florida*, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). We need not further detail the facts in those four cases, for the Supreme Court's discussion of them amply discloses that they do not call for a presumption of prejudice here.

## III. SUFFICIENCY OF THE EVIDENCE.

### A. THE EVIDENCE REGARDING THE USE OF THE MAILS AND WIRES.

The defendant attacks the sufficiency of the evidence on the mail and wire fraud counts in two respects.[5] First, he urges that the evidence was insufficient to support a finding that he "knowingly caused" any matter or thing to be delivered by mail or transmitted by wire. Second, he asserts that the evidence does not support a finding that the mailings and use of the wires were "for the pur-

pose of executing" the scheme. We find the evidence sufficient in both respects.

■■ It has long been clear that the mail fraud statute reaches schemes in which the defendant did not himself place any matter in the mails; it is sufficient to show that he "caused" the mailings. *See United States v. Brickey*, 426 F.2d 680, 684 (8th Cir.), *cert. denied*, 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970). The scope of the wire fraud statute is equally broad. *See United States v. Hancock*, 268 F.2d 205, 206 (2nd Cir.), *cert. denied*, 361 U.S. 837, 80 S.Ct. 89, 4 L.Ed.2d 77 (1959). The standard was set forth in *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954):

> * * * Where one does an act with knowledge that use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he "causes" the mails to be used. * * *

The District Court properly instructed the jury in accordance with this standard. The jury could properly conclude from the evidence that the mailings and wires between the local agents and the home offices were reasonably foreseeable.[6] *See United States v. Minkin*, 504 F.2d 350, 353 (8th Cir. 1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1122, 43 L.Ed.2d 396 (1975) (upholding jury determination that a mailing of twelve miles between

---

5. The defendant also claims that there was a fatal variance between the indictment and the proof, and that the prosecutor kept changing his theory of the fraudulent scheme. We cannot agree. Our review of the record leads us to conclude that the government's theory of guilt was consistently that the defendant had applied for insurance with the intention of causing the death of the insured. The court instructed the jury that, unless the intent to bring about Null's death was present when the applications were made, it must bring in a verdict of acquittal. The defendant was advised of this theory from the very beginning.

6. Each mailing, although in furtherance of a single scheme is a separate offense under the mail fraud statute. *See United States v. Anderson*, 466 F.2d 1360, 1361 (8th Cir. 1972);

*United States v. Williams*, 424 F.2d 344, 351, *affirmed en banc*, 447 F.2d 1285 (5th Cir. 1970), *cert. denied*, 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972); *United States v. Eskow*, 422 F.2d 1060, 1064 (2nd Cir.), *cert. denied*, 398 U.S. 959, 90 S.Ct. 2174, 26 L.Ed.2d 544 (1970); *Atkinson v. United States*, 344 F.2d 97, 98 (8th Cir.), *cert. denied*, 382 U.S. 867, 86 S.Ct. 141, 15 L.Ed.2d 106 (1965). The same is also true under the wire fraud statute. *See Henderson v. United States*, 425 F.2d 134, 138 n. 4 (5th Cir. 1970). We are satisfied that the jury was properly instructed that each mailing or use of the wire must have been reasonably foreseeable, and that the evidence supports the jury's conclusions in this regard. *See note 2, supra.*

broker's office and insurance company was reasonably foreseeable); *Bannister v. United States*, 379 F.2d 750, 752–753 (5th Cir. 1967), *cert. denied*, 390 U.S. 927, 88 S.Ct. 861, 19 L.Ed.2d 988 (1968) (mailings from local insurance agent to home office reasonably foreseeable).

In support of his assertion that the mailings and use of the wires were not "for the purpose of executing the scheme," the defendant cites *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). That case held only that, when the defendant had completed the scheme and received the benefits of it, any further mailing which served to allocate the loss between victims did not come within the purview of § 1341. Since the mailings and use of the wires here occurred before the scheme reached its hoped-for fruition, *Maze* and the other cases cited by the defendant are inapposite. As the Fifth Circuit declared in *Bannister v. United States, supra*, at 753:

> The appellants' * * * assertion, that the mailings occurred subsequent to any misrepresentations they may have made to the Insurer and therefore were not incident to the execution of any essential part of the scheme but rather after the scheme had been fully executed, *Kann v. United States*, 1944, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88, 157 A.L.R. 406; *Parr v. United States*, 1960, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277, is patently without merit. This merely cleared the first hurdle in the inception of the scheme. The fulfillment of the fraud—acquisition of the proceeds—yet remained.

### B. EVIDENCE OF CONSPIRACY.

■ The defendant urges that there was no proof of "a combination of two or more persons," *Cross v. United States*, 392 F.2d 360, 362 (8th Cir. 1968), and that the government had, therefore, failed to make a submissible case on the conspiracy count. We reject that contention. The evidence permitted a finding that defendant's father, as well as an unknown murderer, were co-conspirators in the scheme.

### IV. EVIDENTIARY RULINGS.

### A. FAILURE OF THE PROSECUTOR TO DISCLOSE INDUCEMENTS TO GOVERNMENT WITNESSES.

■ The defendant claims that he was lied to when the government informed defense counsel that Hintz, Alsop, and Mrs. Alsop had been given no promises of immunity and no financial rewards, since those witnesses were in fact receiving relocation payments while held in protective custody. He asserts that the failure of the prosecutor to disclose such payments requires reversal of the conviction under the holdings in *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

We find no misrepresentation or nondisclosure. The afternoon prior to Hintz's testimony, the government informed defense counsel that no promises of immunity had been made and no benefits had been extended other than those normally "associated with witness protection." Defense counsel did not probe that area in cross-examining Hintz, but did reserve the right to recall him. During cross-examination of Alsop, defense counsel brought out the amount and duration of payments which he had received under the witness relocation program. The defense did not recall Hintz to the stand, but in closing argument, counsel stressed that "you can pretty well surmise that if they're paying John Alsop they're paying good old Charlie [Hintz] as well." Defense counsel was in no way misled on the subject of inducements, and in deciding not to recall Hintz to the stand, made a tactical decision not to inquire further into the area. The court permitted him to argue the issue to the jury, and there was no prejudice.

## B. RESTRICTIONS ON THE SCOPE OF THE CROSS–EXAMINATION OF HINTZ.

The defendant claims that his inquiry in cross-examination of Hintz was improperly cut short in two areas: (1) as to whether the witness had ever violated the Mann Act; and (2) as to whether the witness had been arrested for child molestation. In both instances, although the court circumscribed the inquiry, it permitted questioning coextensive with the defendant's theories of admissibility.

The defendant urged that evidence on both subjects was relevant to the question of whether the government had offered any inducements of immunity to Hintz. The court indicated that it would allow defense counsel to ask Hintz if the government had in fact offered inducements of immunity. This was sufficient, under the defendant's theory of relevance, and there was no abuse of discretion in the court's order not to pursue the inquiry further.

The defendant contended that the evidence on child molestation arrests was relevant for the additional purpose of showing that Hintz's testimony that the defendant had tried to use him as a front man was implausible. The defendant claimed that he knew of Hintz's arrest record, and hence would not have suggested use of Hintz's name as beneficiary. The court permitted counsel to ask both Hintz and the defendant whether or not Hintz had told the defendant of such an arrest record, and also indicated that counsel could ask if Hintz had a reputation for such arrests. This line of questioning was adequate to establish the proposition which the defendant sought to prove. Accordingly, the court did not abuse its discretion in ruling that the existence *vel non* of the arrest was irrelevant and inadmissible.

## C. EVIDENCE OF "OTHER CRIMES."

The defendant claims that the government was improperly permitted to present certain evidence which was unduly prejudicial in that it tended to establish that he had committed other crimes not contained in the indictment. The objectionable evidence included:

(1) Testimony of Hintz, Beck, Held and Baker concerning the sizing up of the latter three individuals as prospective business partners, including the testimony of Held and Baker to the effect that the defendant had indicated a desire to insure their lives;

(2) Testimony of Mr. and Mrs. Alsop, relating the defendant's statement to Mr. Alsop that he had killed a prior business partner, Jack Edwards, in an "identical situation;" [7]

(3) Testimony of four other witnesses and the introduction of several exhibits pertaining to the gunshot death of Edwards and the collection by the defendant of insurance proceeds as a consequence of that death; [8]

---

7. Alsop testified that, when he balked at the defendant's request that he murder Null, the defendant declared:

* * * "There's nothing to it."

* * * * * *

* * * "We had the identical situation with Mr. Edwards over there, Jack Edwards. * * * His old lady was pulling the rugs out from under him * * *. I blew his fuck—I blew his head off right across the desk."

Mrs. Alsop corroborated this version of the facts on rebuttal, stating that she had overheard the defendant tell her husband:

* * * "Man * * * there's nothing to it. * * * You know Edwards? * * * [T]here's nobody tripped over a cat * * *

I took the shotgun myself and blew his head off across the desk."

8. The government produced a diagram of the location of the Edwards shooting, a shotgun and shells found at that location (including a matching shell which had been found in the defendant's pocket), and court settlement documents indicating that the defendant had collected nearly $300,000 in insurance proceeds. Two police officers described the scene of the Edwards shooting, testified that the defendant was present, and stated that one Donald Deal told them that he had been holding the shotgun which went off when he tripped over a cat.

Edwards was shot on July 1, 1970, and the insurance settlement was reached in the sum-

(4) Testimony of Walsh, a copartner in the rotary engine partnership, relating the defendant's statement to the partners, after the Null murder, that he had twice previously been a beneficiary on insurance policies on occasions when a partner or employer had been shot—once when Edwards was killed and once when a Mr. Schucardt had been wounded.[9]

Federal Rule of Evidence 404(b), which becomes effective on July 1, 1975, see Pub.L. No. 93–595 (January 2, 1975), declares:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This statement of the "other crimes" rule is consistent with the common law and with the decisions of this Circuit.[10] See United States v. McGrady, 508 F.2d 13, 19 (8th Cir. 1974); United States v. Clemons, 503 F.2d 486, 489 (8th Cir. 1974).

 The admissibility of "other crimes" evidence in accordance with this rule is initially a matter within the sound discretion of the trial judge. Cunha v. Brewer, 511 F.2d 894, 900 (8th Cir. 1975). In exercising that discretion, the trial court must determine that: (1) the evidence is relevant for a purpose other than showing the character or disposition of the defendant; (2) the proof that the acts were committed by the defendant is "clear and convincing;" and (3) the probative value of the evidence outweighs the danger of prejudice to the defendant.[11] See United States v.

---

mer of 1971. No one was ever prosecuted in the killing. Hintz testified that, when the defendant first approached him about a joint business venture, the defendant displayed a check for $300,000, which he explained was the after-tax profits from his latest business venture.

**9.** No further evidence concerning the shooting of Schucardt was ever introduced.

**10.** The "other crimes" or "character" rule has undergone a metamorphosis in most American jurisdictions from a rule of inclusion—the evidence is admissible unless its sole relevance is to the disposition of the defendant—to a rule of exclusion—the evidence is excluded unless it falls within a few specifically defined categories, primarily those enumerated in Federal Rule of Evidence 404(b). See Stone, Exclusion of Similar Fact Evidence: America, 51 Harv.L. Rev. 988, 989 (1951); I Wigmore on Evidence § 216 at 713 (3d ed. 1940). The change in emphasis is most likely due to an increased sensitivity to the dangers of such evidence. Nevertheless, admissibility of "other crimes" evidence cannot be a mechanical process. As we stated in Cunha v. Brewer, 511 F.2d 894, 900 (8th Cir. 1975):

> * * * The process * * * "is not merely one of pigeonholing, but one of balancing, on the one side, the actual need for the other-crimes evidence in light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other-crimes evidence in supporting the issue, and on the

other, the degree to which the jury will probably be roused by the evidence to overmastering hostility." McCormick, [The Law of Evidence] § 190 at 453 [(2d ed. 1972)]. See also United States v. Clemons, 503 F.2d 486, 489–491 (8th Cir. 1974).

**11.** The rule is based on three dangers in the presentation of "other crimes" evidence. First, it is feared that

> * * * a jury might overestimate the probative value of such evidence by assuming that merely because the defendant has committed crimes before, he is likely to be guilty of the offense charged. * * *

Case Note, 87 Harv.L.Rev. 1074, 1076 (1974). Second, is

> * * * the recognized tendency of men to punish a bad man now that he has been caught, even though his guilt on this occasion has not been satisfactorily established. * * *

Morgan, Basic Problems of Evidence 200 (1962). And finally, it is felt that it is unfair to require a defendant to defend against and disprove crimes for which he has never been charged or indicted.

Yet there is a tension in the rule, for evidence probative of material facts at issue may incidentally implicate the defendant in other crimes, and to exclude such evidence merely because it tends to show that the defendant is a bad man would "handicap the State in its prosecution of the man of cumulative criminal daring." I Wigmore, supra § 216 at 712. The true purpose of the rule must thus be "to impel to a greater caution in determining * * relevancy in a given instance." Id. at 717.

*Gocke,* 507 F.2d 820, 825 (8th Cir. 1974); *United States v. Clemons, supra* at 489. If the evidence is admitted, the court should give a limiting instruction, informing the jury of the narrow purpose for which it has been admitted. *See Goodman v. United States,* 273 F.2d 853, 857 (8th Cir. 1960); *King v. United States,* 144 F.2d 729, 732 (8th Cir. 1944), *cert. denied,* 324 U.S. 854, 65 S.Ct. 711, 89 L.Ed. 1413 (1945).

■ We conclude that the trial court did not abuse its discretion in admitting the disputed evidence. The testimony of Hintz, Beck, Held and Baker, concerning the defendant's business negotiations with the latter three individuals, was not evidence of "other crimes," but rather described integral parts of the very crime for which he was convicted.[12] *See United States v. Cochran,* 475 F.2d 1080, 1082–1083 (8th Cir.), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); *United States v. Gallington,* 488 F.2d 637, 641 (8th Cir. 1973), *cert. denied,* 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974). The defendant's search for an appropriate victim, analogous to the "casing" of several banks before robbing the most suitable target, was properly admitted as evidence of preparation and planning. *See* Federal Rule of Evidence 404(b).

■ Similarly, the testimony of Walsh, relating the defendant's statements to the partners after the Null murder, was evidence of the defendant's conduct in carrying out the very crime charged. In disclosing and giving innocent explanations for the Edwards and Schucardt shootings, the defendant may have been attempting to enlist the aid of the partners in an anticipated fight to recover the proceeds on the Null policies from reluctant insurers. He may also have been seeking to assuage any suspicions which might later arise and to cover up his role in Null's death. The government did not seek to prove that the statements were true, but only that they had in fact been made. As such, the statements were "verbal acts" made in furtherance of the fraudulent scheme and were admissible on that ground.[13] *See* VI Wigmore on Evidence § 1766 at 177–180 (3d ed. 1940).

■ The testimony of both Mr. and Mrs. Alsop relating the defendant's statement that he had personally shot Edwards was likewise admissible. The defendant was attempting to induce Alsop to become an accomplice, and the making of the statement was as much an act in furtherance of the crime as the defendant's offer to pay Alsop $5,000 to murder Null. As such, it was admissible as a verbal act.[14]

---

12. The defendant did not object at trial to the testimony of Hintz, Beck, Held or Baker on the ground that such testimony was evidence of "other crimes" or was probative solely of the defendant's character. That contention is raised for the first time on appeal.

13. Perhaps as a technical matter, the court should have instructed the jury that the statements were being received only as evidence of conduct, and should not be taken to establish that the defendant had in fact been a beneficiary in the past. However, the defendant did not request such a limiting instruction and, for obvious reasons, did not contest the truth of the exculpatory matter contained in the statements. Moreover, there was ample corroborative evidence—independently admissible—to establish that he had been beneficiary on the Edwards policy. Under the circumstances, the failure to give a limiting instruction was not prejudicial.

14. The defendant did not object to this testimony at trial, did not claim that it was inad-

missible as evidence of "other crimes," and did not request that the court give any instruction limiting its use. Had the defendant expressed his objections in a timely fashion, the court could have contemplated the option of instructing the jury that the testimony was admitted only for the purpose of establishing that the statement had been made, and not for the purpose of showing that the statement was true and that the defendant had in fact killed Edwards. In light of our conclusion that the court properly admitted evidence concerning the circumstances of Edwards' death, *see* p. 908, *infra,* we cannot say that it was plain error for the court to fail to so limit the admissibility of the Alsops' testimony. If the defendant's boast that he had killed Edwards was true, this was highly probative of the intent with which he applied for insurance on Null's life, and also helped to explain his motivation for devising the scheme in the manner chosen. *See* note 15, *infra.*

The trial court ruled that the facts surrounding the Edwards shooting and the proof of the defendant's collection of the proceeds were relevant to a material fact at issue: whether the defendant intended to defraud the insurance companies when he applied for and purchased the insurance on Null's life. We agree.[15] The court instructed the jury that the government had the burden of proving that the defendant intended to defraud the insurance companies at the time when he caused the use of the mails and wires. We have previously held in mail fraud cases that evidence of other offenses by the defendant is admissible to show criminal intent where the other offenses are similar to and not too remote in time from the offense charged. *See, e. g., United States v. Bessesen,* 433 F.2d 861, 864 (8th Cir. 1970); *Goodman v. United States, supra* at 857; *King v. United States, supra* at 732–733; *Samuels v. United States,* 232 F. 536, 542 (8th Cir. 1916). Cases in other Circuits are to the same effect. *See, e. g., United States v. Mancuso,* 444 F.2d 691, 695 (5th Cir. 1971); *United States v. Larsen,* 441 F.2d 512, 514 (9th Cir. 1971); *United States v. Hutul,* 416 F.2d 607, 624 (7th Cir. 1969), *cert. denied,* 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970); *New England Enterprises, Inc. v. United States,* 400 F.2d 58, 70 (1st Cir. 1968), *cert. denied,* 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969); *United States v. Deaton,* 381 F.2d 114, 117–118 (2nd Cir. 1967).

Having properly concluded that the evidence of the circumstances of Edwards' death was relevant to the issue of intent, the trial court did not abuse its discretion in determining that the probative value of the evidence outweighed its prejudicial effect. The jury had already heard, without objection, the defendant's own words in which he boasted that he had personally shot Edwards. Under the circumstances, any additional prejudice which would flow from laying before the jury an accurate account of the Edwards' shooting was minimal. Nor was there any doubt that the basic facts testified to by the police officers and attested to by the document proving collection of insurance proceeds were established by "clear and convincing" evidence. And the larger fact which the government was trying to establish—that the defendant had previously defrauded an insurance company under like circumstances by causing the death of Edwards—was supported by the admission of the defendant to Alsop.

Finally, the court properly instructed the jury that it was to consider the evidence solely as it showed the requisite intent, and further instructed that it could only consider the evidence after it had concluded from independent evidence that the other elements of the offense had been proven. *See New England Enterprises, Inc. v. United States, supra* at 70; *Goodman v. United States, supra* at 857; *King v. United States, supra* at 732–733; *Samuels v. United States, supra* at 542.[16]

### D. ATTORNEY–CLIENT PRIVILEGE.

John Walsh, one of the partners, was permitted to testify, over objection, about a conversation held in his home within a week of Null's death, at which four of the partners and the defendant were present. In the course of that

---

15. We conclude that the evidence was also admissible for the purpose of showing the defendant's motive for devising the scheme in the manner chosen. The disputed evidence helped clarify why he was willing to split his profits with a "front man," rather than himself becoming the sole copartner and named beneficiary. It also helped to explain why the defendant may have decided to hire a killer and create the alibi of a trip to Florida, rather than commit the murder himself.

16. At least one court has gone further than our Court, and has permitted proof of similar incidents to be admitted to establish the corpus delicti. *See United States v. Woods,* 484 F.2d 127, 136 (4th Cir. 1973), *cert. denied,* 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed.2d 875 (1974) (murder), *noted in* 87 Harv.L.Rev. 1074 (1974). *See generally* Stone, *supra* note 10 at 1018.

meeting, the defendant informed the partners that he had twice previously been a named beneficiary on insurance policies on occasions when the insured had been shot, and he gave innocent explanations for the shootings. The defendant contends that the testimony should have been excluded on the ground of attorney-client privilege,[17] because one of the four partners present, Judge Gaertner, was an attorney who not only performed legal work for the partnership, but had also advised the defendant to speak freely to the police following Null's death.[18]

 Assuming arguendo that the defendant's statements during the meeting were confidential communications between client and attorney, we are satisfied that the conversations were properly admitted. Federal Rule of Evidence 501 provides that questions of privilege are to be governed by the common law, in the absence of a Supreme Court rule, federal statute, or constitutional provision. At common law, it is settled that confidential communications from client to attorney are not privileged if the court concludes the evidence warrants a finding that the communications were made for the purpose of obtaining aid in the commission of future criminal acts.[19] See United States v. Goldenstein, 456 F.2d 1006, 1011 (8th Cir. 1972); United States v. Bartlett, 449 F.2d 700, 704 (8th Cir. 1971), cert. denied, 405 U.S. 932, 92 S.Ct. 990, 30 L.Ed.2d 808 (1972); United States v. Billingsley, 440 F.2d 823, 827 (7th Cir.), cert. denied, 403 U.S. 909, 91 S.Ct. 2219, 29 L.Ed.2d 687 (1971); VIII Wigmore on Evidence § 2298 (McNaughton Rev.1961). See also Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933) (dictum). "The privilege takes flight if the relation is abused." Id. In applying this exception to the doctrine of privilege, it is the client's purpose which is controlling, and it matters not that the attorney was ignorant of the client's purpose in making the statements. See id.; United States v. Aldridge, 484 F.2d 655, 658 (7th Cir. 1973), cert. denied, 415 U.S. 921, 94 S.Ct. 1423, 39 L.Ed.2d 477 (1974).

 The evidence warranted a finding that the defendant, by his statements, sought to enlist the aid of the partners—attorney and non-attorney alike—in carrying to its fruition the scheme to defraud the insurance companies. In light of the anticipated reluctance of Lloyds of London to pay over the proceeds on the two million dollar policy, the defendant would get his share of those fruits of the scheme only if the partnership (the beneficiary) vigorously pressed its rights under the policy. The defendant's disclosure and innocent explanation of the prior incidents was a means of preparing the partners for the shock of battle and stiffening their resolve to fight. Hence, the statements were not an instance of mere concealment of past wrongdoing, as where a client falsely tells his attorney that he did not commit a past criminal act. See VIII Wigmore, supra § 2298 at 572–573. Rather, the statements were an induce-

---

17. The defendant alternatively claims that this testimony was inadmissible as evidence of "other crimes." See pp. 906, 907, supra.

18. The court had previously excluded the testimony of Judge Gaertner, when he was asked to describe the same conversations, because it concluded that Judge Gaertner stood in an attorney-client relationship to the defendant. While agreeing with the prosecution that a strong argument could be made that the meeting at Walsh's home was strictly a business discussion, in which Judge Gaertner was acting as a partner, rather than as an attorney, the court declared that it would rather err on the side of caution. In our view, it would have been proper to admit Judge Gaertner's testi-

mony as to what was said at the meeting in Walsh's home.

19. Further evidence of the common law is found in ALI, Model Code of Evidence § 212 (1942):

No person has any privilege under Rule 210 [Communication Between Lawyer and Client] if the judge finds that sufficient evidence, aside from the communication, has been introduced to warrant a finding that the legal service was sought or obtained in order to enable or aid the client to commit or to plan to commit a crime or a tort.

Accord, Uniform Rule of Evidence 26(2) (1953).

ment to future action in which the partners would become the defendant's unwitting pawns in playing out the last act of the fraud. There was no error in the failure to exclude Walsh's testimony.

### E. HEARSAY TESTIMONY BY MRS. NULL.

Over objections, the widow of the deceased inventor was permitted to testify that, shortly before the murder of her husband, they had a series of conversations in which Null declared that he intended to speak to the defendant about cancelling the insurance and getting out of the partnership. The defendant urges that this was inadmissible as hearsay. We do not agree.

■ The evidence was admitted for the purpose of showing that it was likely that Null had in fact approached the defendant and sought to back out of the partnership and cancel the insurance; in other words, that he had acted in conformity with his expressed intentions. Whether he had so acted was a material fact since, if true, it would establish the immediate motivation for the defendant's visit to Alsop. It would also corroborate Alsop's testimony that the defendant had stated that the shooting must be accomplished quickly because the victim "wanted to cancel the policies or get out." The government properly anticipated that the defendant would place this material fact in issue by denying that Null had expressed any such desire to him and by denying Alsop's testimony.

■ A declarant's out-of-court statement of intention is admissible to prove that the declarant subsequently acted in conformity with that intention, if the doing of that act is a disputed material fact.[20] *Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892); Federal Rule of Evidence 803(3). *See also* McCormick,

Handbook on the Law of Evidence § 295 (2d ed. 1972); Tribe, *Triangulating Hearsay,* 87 Harv.L.Rev. 957, 969–971 (1974); Maguire, *The Hillmon Case—Thirty-three Years After,* 38 Harv.L.Rev. 709 (1925). Mrs. Null's testimony as to her husband's expressed intentions was properly admitted for this purpose.

### F. GOVERNMENT EXHIBIT 11.

Government Exhibit 11 was an "office reference sheet" used by the Prudential Insurance Company home office in handling the father's (James Calvert's) application for insurance on Null's life. An underwriter for Prudential, Mrs. Flynn, testified that the form was maintained in the regular course of business for each application for insurance exceeding $50,000, and that she had initiated this particular form. The form, which contained numerous entries by various employees of Prudential, was used to route the file to the appropriate employees and to maintain a record of its progress.

■ The defendant contends that the exhibit was not admissible under the "business records statute," 28 U.S.C. § 1732, because it was not a memorandum or a recording of "any act, transaction, occurrence, or event." He objects particularly to the final entry, made by Mrs. Flynn, which reads:

7/7 Mrs. Phillips—Pls. send rej. letter to Mr. Calvert per above. MEF

He urges that it was prejudicial to introduce this notation because the jury would use it to infer that the Calverts had been notified of rejection by Prudential—a fact which defendant denied—and had knowingly misrepresented this fact to New England. We have no doubt that the disputed notation, recording the decision to reject the defendant's application and the corresponding direction to write a letter so advising him, recorded an "act" or "event" within the meaning of the statute.

---

**20.** Although the Federal Rules of Evidence do not limit the admission of such evidence to instances where the declarant is unavailable, some commentators have urged that the hearsay exception should be so limited. *See,*

*e. g.,* McCormick, Handbook on the Law of Evidence § 295 at 698 (2d ed. 1972). Since Null was deceased, the evidence would have come in even under this more restricted view.

The defendant further contends that the exhibit was inadmissible because it contained "hearsay, opinions, surmise, unsubstantiated reports, and other non-facts." Federal Rule of Evidence 803(6) provides that opinions of an employee recorded in the regular course of business are admissible

> * * * unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. * * *

And the statute expressly provides that the

> * * * lack of personal knowledge by the entrant or maker, may be shown to affect [a business record's] weight, but such circumstances shall not affect its admissibility.

28 U.S.C. § 1732(a). The admission of business records under the statute is a matter within the discretion of the trial court. *See Hanley v. United States,* 416 F.2d 1160, 1168 (5th Cir. 1969), *cert. denied,* 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970). We find no abuse of discretion with respect to the admission of Government Exhibit 11.

### G. PICTURES OF THE VICTIM'S BODY.

The defendant objected to the introduction of two black and white photographs, taken at the scene of the slaying, showing the victim lying face down in a pool of dried blood with the pockets of his trousers pulled inside out. Various objects were depicted, scattered around the body. The government contends that it was proper for the court to admit the pictures, for they tended to support the testimony of Mr. and Mrs. Alsop that the defendant wanted someone to kill Null and make it look like a robbery. The defendant, on the other hand, urges that it was not necessary to introduce the pictures to establish the fact that the murder scene had been made to appear as if robbery were the motive; not only did police officers testify about the condition of the body and scene of the crime, but the defendant never disputed the physical circumstances of Null's death.

We agree with the defendant that the photographs should have been excluded as irrelevant. Since the jury was not required to find beyond a reasonable doubt that the defendant had in fact caused Null's death, but only that he intended to do so, the probative value of this cumulative evidence as to the manner of Null's death was very slight. *Compare United States v. Hoog,* 504 F.2d 45, 49–50 (8th Cir. 1974), *cert. denied,* 420 U.S. 961, 95 S.Ct. 1349, 43 L.Ed.2d 437 (1975); *United States v. Delay,* 500 F.2d 1361, 1366 (8th Cir. 1974). Nevertheless, the photographs were cumulative. A great deal of other evidence about the circumstances of Null's death, including the testimony of police officers, came in without any objection. In light of the fact that this other evidence was already before the jury, we are convinced that the verdict would not have been altered by the exclusion of the two photographs. The other evidence of the defendant's guilt was strong and convincing. *See* pp. 900–901 and note 2, *supra.* The abuse of discretion in permitting the photographs to be admitted was "harmless error." *See Kotteakos v. United States,* 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *Cf.* 28 U.S.C. § 2111.

### H. REBUTTAL TESTIMONY BY MRS. ALSOP.

While conceding that the scope of rebuttal is a matter for the sound discretion of the trial court, *see e. g., United States v. Armstrong,* 462 F.2d 408, 411 (8th Cir. 1972), the defendant urges that it was reversible error for the court to permit the rebuttal testimony of Mrs. Alsop. He asserts that her testimony was merely cumulative of that of her husband, and the government's failure to call her to the stand during its case in chief should have precluded her testimony after the defense had rested.

The mere fact that testimony could have been admitted on direct does

not preclude its admission on rebuttal.[21] *See United States v. Pennett,* 496 F.2d 293, 299 (10th Cir. 1974); *United States v. Marsh,* 451 F.2d 219, 220–221 (9th Cir. 1971). Nevertheless, courts disfavor the deliberate tactic of "lying in the weeds" in anticipation of an ambush, and it is within a trial court's discretion to exclude rebuttal if it concludes that the prosecution has acted unfairly. In this instance, we find no abuse of discretion in permitting the testimony. Mrs. Alsop was in the protective custody of the government. During the case in chief, her testimony would have been merely cumulative of that of her husband, and the prosecution may have delayed calling her to the stand in the hope that her testimony would not be needed. However, after the defendant had presented his case, including his contention that Alsop was not being truthful about the content of their talks, it was appropriate for the government to rebut that claim by putting Mrs. Alsop on the stand to testify as to what she had overheard. *See Lake v. United States,* 302 F.2d 452, 454–455 (8th Cir. 1962).

## V. JURY INSTRUCTIONS.

■ The defendant complains of the court's failure to give three proffered instructions. We find no error in this regard. The defendant's proposed instruction number 12–A would have required the jury to find "that the defendant specifically contemplated" the use of the mails or wires, and that "without such use * * * the alleged scheme could not have succeeded." Our Court has recently reiterated the Supreme Court's holding that that is not the proper standard of law:

> * * * [I]t is not a *sine qua non* of the statutory offense that there be negation of means of communication oth-

er than the mails. The defendant argues that the checks, for example, "could just as well have been hand carried to Eugene Britton as mailed," or, we add, that conceivably railway express could have been used, or a parcel delivery service. But the test, under the statute, is realistic, not fanciful. "It is not necessary," held the Supreme Court in *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954), "that the scheme contemplate the use of the mails as an essential element," but merely that it be "incident to an essential part of the scheme," and that "such use can reasonably be foreseen, even though not actually intended."

*United States v. Britton,* 500 F.2d 1257, 1259 (8th Cir. 1974) (footnote omitted).

■ The defendant's proposed instruction number 13 would have told the jury that they must disregard the defendant's acts in concealing his identity from the insurance companies and in concealing from the companies his financial backing of his father's venture. We find no error in the court's refusal to give the instruction. The concealment was a vital part of the fraudulent scheme in light of the fact that the defendant had previously collected proceeds under similar circumstances and in light of his statement to Hintz that he needed a "front man" because he had used the ruse in the past.

■ The defendant's proposed instruction number 15 would have required the jury to find that he "had the intent to be responsible for or participate in the murder of Victor Null." The court did give this instruction at least twice in slightly modified form—once for the conspiracy count and once for the substantive counts. Indeed, in the latter

---

21. * * * It may be assumed that the testimony would have been proper for the case in chief. But certain testimony may be proper both in chief and in rebuttal. The offering of the testimony at the beginning may not seem necessary at the moment, and while prosecutors have a duty to play fair with defendants, it is not unfair to offer testimony on rebuttal which is proper rebuttal, although it might have been offered in chief. * * *

*Samish v. United States,* 223 F.2d 358, 365 (9th Cir.), *cert. denied,* 350 U.S. 848, 76 S.Ct. 85, 100 L.Ed. 755 (1955).

instance, the modified instruction was even more favorable to the defendant, since the court told the jury that it could convict only if it found that the defendant had the intent to bring about Null's death at the time of each use of the mails or wires. There is no merit to the defendant's claim that his proposed instruction number 15 was wrongfully withheld.

## VI. THE SENTENCING PROCESS.

### A. FAILURE TO DISCLOSE THE PRESENTENCE REPORT.

The District Court rejected the defendant's request that the presentence report be made available to him. The court did give a rough oral synopsis of the contents,[22] declaring that they were "innocuous," and that the report contained no meaningful information other than that which had already been brought out at trial.

There is a difference of opinion among the members of this Court as to how far a sentencing judge should be required to go in disclosing to a defendant the presentence report or its contents. *Compare United States v. Dace,* 502 F.2d 897, 899–901 (8th Cir. 1974), *cert. denied,* 419 U.S. 1121, 95 S.Ct. 803, 42 L.Ed.2d 820 (1975) *and United States v. Schrenzel,* 462 F.2d 765, 775 (8th Cir.), *cert. denied,* 409 U.S. 984, 93 S.Ct. 325, 34 L.Ed.2d 248 (1972) *with United States v. Dace, supra* at 901–902 (Lay, J., dissenting) *and United States v. Schrenzel, supra* at 775–777 (Heaney, J., dissenting). The immediate evil criticized by the dissenters in those cases was the failure of the sentencing judge to disclose the substance of the report, including any derogatory information, and the consequent lack of op-

portunity to respond to and refute such material. The dissenters urged that, in sanctioning total non-disclosure of the report *or* its substance, the majority violated the principle, announced in *United States v. Carden,* 428 F.2d 1116, 1118 (8th Cir. 1970), and reaffirmed in *United States v. Dace, supra* at 908, that

It is *always* advisable for the trial judge to at least state on the record the various factors he has taken into consideration in rendering his sentence. * * *

(Emphasis supplied).

■ Here, the sentencing judge did disclose the substance of the presentence report, and we have determined from independent review of the report that his disclosure was accurate. While, in our view, it may have been preferable for him to have disclosed the report itself, the defendant was not prejudiced by the approach taken, since the sentencing judge did not rely on any adverse information which had not been presented and open for refutation at the trial. Under the circumstances, we cannot say that the sentence was invalid due to the manner in which the report was handled.

### B. EXCESSIVENESS OF THE SENTENCE.

The defendant's final contention is that the forty-five-year sentence imposed by the court was excessive. He urges that, since he was convicted of only one scheme or course of conduct, the sentence should be vacated and remanded with instructions to the court to resentence the defendant to a total term not in excess of the five-year maximum for violation of the mail or wire fraud

---

22. The court stated:

* * * [T]he pre-sentence report indicates the circumstances; that is, the dates of the trial, outlines the Indictment, it outlines the official version by merely saying the Court is already fully aware of the circumstances of this offense after five weeks of trial. There is indication that the defendant continued to maintain his innocence when interviewed.

The prior record is minor; traffic violations, of which the Court takes no concern of any

kind. The family history is outlined and contains no indication of any prior record or anything like that and it's nothing—home and neighborhood, the education, the religion, the interest and activities, employment. In fact, the pre-sentence report does not even mention many of the things that were brought out in trial. * * * In other words, the pre-sentence report insofar as anything negative other than the information which came out in trial is, I would say, innocuous.

statutes. This contention is utterly without merit.

 It is well settled that each use of the mails is a separate offense under the mail fraud statute, notwithstanding the fact that the defendant may have been engaged in one fraudulent scheme. *See, e. g., Badders v. United States,* 240 U.S. 391, 394, 36 S.Ct. 367, 60 L.Ed. 706 (1916); *United States v. Ashdown,* 509 F.2d 793, 800 (5th Cir. 1975); *United States v. Anderson,* 466 F.2d 1360, 1361 (8th Cir. 1972); *United States v. Dreer,* 457 F.2d 31, 34 (3rd Cir. 1972).[23] The same is true of the use of the wires under the wire fraud statute. *See Henderson v. United States,* 425 F.2d 134, 138 n. 4 (5th Cir. 1970). It is also well settled that cumulative punishment may be imposed for a conspiracy and for the substantive offense. *See Iannelli v. United States,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616, 623 (1975). The defendant was convicted of twelve counts, each of which carried a maximum possible punishment of five years imprisonment. Hence, his forty-five-year sentence was well within the statutory maximum.

The rule in this Circuit is that

* * * "A sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review." *United States v. Tucker,* 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). * * *

*Woosley v. United States,* 478 F.2d 139, 141 (8th Cir. 1973) (en banc). However, we do

* * * possess the power to review the severity of a criminal sentence within narrow limits where the court has manifestly or grossly abused its discretion. * * *

*Id.* at 147.

 We conclude, on the basis of all the evidence adduced at trial, that the sentence imposed by the District Court was not excessive as a manifest or gross abuse of discretion. The defendant stood convicted of a coldblooded scheme, involving the stalking and selecting of a victim with the intention of murdering him for the purpose of obtaining money. We cannot say that the sentence imposed was "manifestly disproportionate to the nature of the crime." *Woosley v. United States, supra* at 148. *Cf. United States v. Smallwood,* 443 F.2d 535, 543 (8th Cir.), *cert. denied,* 404 U.S. 853, 92 S.Ct. 95, 30 L.Ed.2d 93 (1971) (upholding convictions of thirty-five and twenty years for mail fraud violations which did not involve loss of life); *United States v. Delay, supra* at 1368 (upholding one hundred-year sentence for a "heinous crime" involving bank robbery and murder). *But see United States v. Mackay,* 491 F.2d 616, 624–625 (10th Cir. 1973), *cert. denied,* 416 U.S. 972, 94 S.Ct. 1996, 40 L.Ed.2d 560 (1974) (finding fifteen consecutive sentences under the mail fraud statute to be "excessive").

The conviction and the sentence imposed by the District Court are affirmed.